[No. S043446. May 8, 1995.]

In re CRAIG ANTHONY ROSS on Habeas Corpus.

**COUNSEL**

Nicholas C. Arguimbau, under appointment by the Supreme Court, Margolin, Auguimbau & Battson and Steven E. Feldman for Petitioner.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Susan Lee Frierson, Sharlene A. Honnaka and Susan D. Martynec, Deputy Attorneys General, for Respondent.

**OPINION**

**ARABIAN, J.**—Petitioner Craig Anthony Ross seeks relief on habeas corpus from the judgment of death entered against him in Los Angeles Superior Court, Case No. A365075. On direct appeal, we affirmed that judgment and a judgment of death against the codefendant, Steven Allen Champion. (*People* v. *Champion* (1995) 9 Cal.4th 879 [39 Cal.Rptr.2d 547, 891 P.2d 93].)

In this matter, we issued an order to show cause based on petitioner's allegation that trial counsel was ineffective for failing to present available

mitigating evidence at the penalty phase of his capital trial. We appointed the Honorable Michael Tynan, Judge of the Los Angeles Superior Court, to take evidence and make findings of fact on six questions. Judge Tynan has issued a report responding to the six questions, and in addition concluding that trial counsel provided ineffective representation at the penalty phase and that there is a reasonable probability the result would have been more favorable for petitioner in the absence of counsel's failings. We uphold most, although not all, of the referee's factual findings, but disagree with his legal conclusions. We find that petitioner has not shown a reasonable probability that the result would have been different but for counsel's unprofessional errors. Accordingly, we discharge the order to show cause, and deny the petition for writ of habeas corpus.

## I. FACTS

### A. *The Trial*

In 1982, a jury convicted petitioner of three counts of murder, five of robbery, two of burglary, and one of rape in concert, finding that he was armed with a firearm in the course of each offense. On each count of murder, the jury found special circumstances of robbery murder, burglary murder, and multiple murder, and on one of the murder counts also found a rape-murder special circumstance. Both petitioner and the codefendant at trial, Steven Allen Champion, who was convicted of some of these crimes, were sentenced to death.

The facts giving rise to these convictions are described in greater detail in our opinion in the direct appeal. (*People* v. *Champion, supra,* 9 Cal.4th at pp. 898-902.) Briefly, the evidence at the guilt phase of petitioner's trial disclosed that on December 12, 1980, petitioner and three accomplices burglarized the home of Bobby Hassan, a marijuana dealer, ransacked the house, and murdered both Bobby and his son, Eric Hassan, by shooting them in the head while they were lying on a bed. Bobby's hands were tied behind his back. The evidence also indicated that on December 27, 1980, petitioner and three accomplices burglarized the home of Michael, Cora, and Mary Taylor, robbing the occupants and murdering Michael Taylor. Petitioner forced Mary Taylor to enter the bathroom, where he raped her. The prosecution offered no evidence showing who fired the shots that killed either the Hassans or Michael Taylor.

At the penalty phase of the trial, the prosecution presented evidence that on July 29, 1977, petitioner shot Mark Howard. Howard was in Helen Keller Park, in the Los Angeles area, when Walter Gregory approached and said

that petitioner wanted to talk to him. Howard walked to another part of the park and spoke to petitioner, who was with a group of people. Petitioner demanded that Howard return a radio that Howard had taken from Gregory. Howard said he took the radio because Gregory owed him money, and refused to return it. Petitioner then produced a revolver, and said that if Howard did not return the radio he would blow Howard's head off. Howard slapped petitioner, whereupon petitioner shot Howard six times in the stomach and the chest. Howard recovered, but a bullet remains lodged close to his spine, and his ability to use his left leg is seriously impaired. As a result of this incident, petitioner pleaded guilty to assault with a deadly weapon, and was sentenced to three years in prison.

Petitioner presented no witnesses at the penalty phase of trial. At petitioner's request, the parties stipulated that Howard was once associated with the Denver Lanes and Athens Park Boys gangs. Also at his request, the court took judicial notice that Jerome Evan Malett, an accomplice in the murder of Michael Taylor, had been convicted of eight offenses arising out of that episode, including first degree murder with personal use of a firearm, and had been sentenced to a prison term of 46 years to life. The parties also stipulated that petitioner was born on February 1, 1959, and thus was 21 years old at the time of the murders.

## B. *The Reference Hearing*

We asked the referee to take evidence and make findings of fact on these questions:

"1. What mitigating character and background evidence could have been, but was not, presented by petitioner at his penalty trial?

"2. What investigative steps by trial counsel, if any, would have led to such items of evidence?

"3. What investigative steps, if any, did trial counsel take in an effort to gather mitigating evidence to be presented at the penalty phase?

"4. What tactical or financial constraints, if any, weighed against the investigation or presentation of mitigating character and background evidence at the penalty phase?

"5. What evidence damaging to petitioner, but not presented by the prosecution at the guilt or penalty trials, would likely have been presented in rebuttal if petitioner had introduced any such mitigating character and background evidence? [Citation.]

"6. Did petitioner himself request that either the investigation or the presentation of mitigating evidence at the penalty phase be curtailed in any manner? [Citation.] If so, what did petitioner request?"

The evidence presented at the reference hearing regarding these questions, and the referee's findings, are summarized below.

1. *"What Mitigating Character and Background Evidence Could Have Been, But Was Not, Presented by Petitioner at His Penalty Trial?"*

The referee found that 15 witnesses were available to testify about petitioner's childhood and family life. At the reference hearing, each of them stated they were available at petitioner's penalty trial, but petitioner's attorneys never asked them to testify.

Petitioner was born in 1959, to Gloria and Stafford Ross, the fifth of Gloria's six children. When petitioner was about three months old, Gloria and Stafford separated. Thereafter, Gloria and the children left Los Angeles for Oakland. Gloria became romantically involved with Henry Brown, who had three sons. In 1963, the couple moved to Los Angeles and began living together (along with her six and, after 1966, his three children). They married in 1966. Gloria and Henry separated in 1971, when petitioner was 12 years old, and then reconciled around 1978.

The testimony of the 15 potential witnesses is summarized below, listed in the order in which it appears in the referee's report, and in which the witnesses testified at the reference hearing.

1. *Shelene Hearring* testified that she is petitioner's older sister. In 1982, when petitioner's murder trial took place, she was a psychiatric technician for the Veterans Administration Medical Center in the State of Washington.

Petitioner's father, Stafford Ross, repeatedly beat and stabbed petitioner's mother, Gloria, including when she was pregnant with petitioner. Gloria also had a bad relationship with her second husband, Henry Brown. Henry was an alcoholic and a gambler, who beat his wife when he had been drinking. Henry and Gloria fought several times a week. On one occasion, Henry began beating Gloria, and when petitioner's aunt Gwen stepped in, Henry threatened to throw a television set at her. Petitioner's uncle Alvin, a police officer, then arrived and arrested Henry.

Henry Brown frequently beat Gloria's children with a thick belt that was part of his postman's uniform, and with tree switches. When he had been

drinking, Henry beat the children for no apparent reason. During these beatings, Henry swung widely, sometimes hitting the children with the buckle end of his belt. He would whip the boys in the family, including petitioner, more often than the girls, and on several occasions Shelene saw welts on petitioner's body from the whippings. Sometimes Henry forced the children to kneel in the garage for hours.

The family lived in a rough neighborhood. Petitioner often took care of his younger siblings, and walked his younger sisters to school to protect them against attacks. As of the time of trial, no member of petitioner's family had been in trouble with the law other than petitioner.

Shelene came to the trial on only one occasion. On that day, she attempted to speak to petitioner's lead attorney, Gerald Lenoir, about petitioner's case; Lenoir told her that he did not have time to talk to her. Shelene was never interviewed by any attorney or defense investigator regarding testimony she could offer on petitioner's behalf.

2. *Leatrice Williams* testified that she is petitioner's grandmother. Petitioner came with his brother and sisters to visit her at her farm every year until he was about 14 years old. During his visits, petitioner would help with the chores and care for the animals. She did not see petitioner often after he turned 14.

3. *Murdie Faye Washington* is petitioner's aunt. At the time of petitioner's trial in 1982, she was a chief legislative analyst for the City of Los Angeles. Washington testified that petitioner's father, Stafford, had beaten and stabbed petitioner's mother, Gloria. Although Washington never saw Gloria's second husband, Henry, beat Gloria, she saw bruises from such beatings on Gloria's body, and heard Henry subject Gloria to verbal abuse.

Petitioner became an occasional babysitter for Washington's children when he was about 11 years old; he was good to her children. Washington would have been willing to testify on petitioner's behalf at the penalty phase of the trial, but petitioner's attorneys never discussed the possibility with her. She came to the trial on several occasions, but whenever she tried to meet with petitioner's attorneys, they said they were too busy.

4. *Geraldine Gray* testified that she is petitioner's aunt. At the time of petitioner's trial, she was an analyst in the workers' compensation department of a law firm. Petitioner's stepfather, Henry Brown, had a drinking and gambling problem. On several occasions, often with petitioner present, Gray saw Henry beat Gloria. In his relations with the children, Henry acted "not

like a father but like a dictator . . . [n]ever showing any love . . . ." Whenever she came to visit, petitioner would take care of her children. Petitioner was "excellent" with the children.

During petitioner's trial, Gray met petitioner's attorney, and told him that she was willing to testify on petitioner's behalf. A woman took her phone number and told her she would be called if she were needed. No one ever called her.

5. *Cynthia Sheperd* testified that she is petitioner's sister, four years older than petitioner. Petitioner's stepfather, Henry, stabbed Gloria on several occasions in petitioner's presence when Sheperd was between eight and ten years old. Henry liked to go to the racetrack; when he lost, he came home angry, drank excessively, and was violent to his wife and children. Once when Sheperd tried to stop Henry from hurting her mother, Henry pushed them both through a glass window. Another time when Sheperd came to her mother's defense, Henry hit Sheperd in the face with his closed fist.

Sheperd described one of Henry's methods of disciplining the children: "He would grab us by the leg, turn us upside down and use a switch or a belt." Petitioner was loving and kind to his siblings. When she was 14 years old, Sheperd went to live with her grandmother, because of the violence in her home.

6. *Karen Stuart* testified that she is petitioner's first cousin, and that he was kind and gentle when put in charge of younger relatives who came to visit. Petitioner occasionally babysat for Karen starting when Karen was three or four years old until she was about ten.

7. *Denise Ross* testified that she is petitioner's sister, and that at the time of petitioner's trial she worked for the Los Angeles Unified School District. She testified that her stepfather Henry drank and was violent, hitting her mother, sometimes with a closed fist, and beating petitioner, often with a belt. Petitioner was kind, sharing, and loving with his siblings. He protected his sisters from harassment by others in the neighborhood, and stopped people from taking their lunch money. Denise said that she went to petitioner's trial, and tried to talk to Attorney Lenoir about the case, but that Lenoir was rude and evaded her questions.

8. *Michael Brown* testified that he is petitioner's stepbrother (the son of Henry Brown), is three years older than petitioner, and at the time of petitioner's trial was employed as a truck driver. He also testified that his father Henry often beat petitioner and the other children with a belt. After

Henry and Gloria separated, Henry forbade Michael from seeing petitioner, but they continued to see each other anyway. Michael lived in fear of his father, and in his late teens began to abuse drugs and alcohol, which he attributed to a desire to forget his childhood. In 1980, after Michael's baby drowned in an accident, Michael went on an alcoholic binge. Petitioner helped him stop drinking.

9. *Debra Calloway* testified that she was petitioner's half sister, born a year after petitioner. Calloway and petitioner had different fathers, but the same mother. Their stepfather, Henry Brown often whipped the children with switches and a belt all over their bodies. Henry hit petitioner more than the other children. Once Henry beat petitioner 20 to 30 times with a belt because petitioner came home after curfew. Calloway moved out of the house at the age of 15, after Henry got drunk and attacked her with a butcher knife. She and her brothers and sisters called Henry "monster," and "the devil." She still has bad dreams about Henry's beatings. Until petitioner turned 12, he protected Calloway from children at school who would beat her up and take her milk money. Once, when their stepfather, Henry, was giving her an undeserved whipping, petitioner volunteered to be beaten instead.

10. *Gwendolyn Frazier* is petitioner's aunt and is 15 years younger than petitioner's mother. At the time of petitioner's trial, Frazier was an optician. She had lived with petitioner's family for three months, and testified that petitioner's stepfather, Henry Brown, was a heavy drinker and was physically abusive. In particular, she mentioned two incidents, once when she saw him brandishing a television set, and another time when he threatened to shoot petitioner's mother, Gloria. During these episodes of violence, petitioner would sit and cry.

One day, in court, Gloria had attempted to introduce her to Lenoir, but he "just kept walking."

11. *Alvin Williams* testified that he is petitioner's uncle; at the time of petitioner's trial he was a detective with the Los Angeles Police Department. Williams was present when Stafford Ross, petitioner's father, stabbed his mother, Gloria. When Williams tried to intervene, Ross stabbed Williams in the arm. Gloria was taken to the hospital, where her condition was originally listed as critical; Ross was arrested, and ultimately sent to prison for the stabbing.

Williams also testified that on four occasions he was called to petitioner's house when petitioner's stepfather, Henry Brown, threatened to kill Gloria,

and Williams had to disarm Henry. The children, including petitioner, were present on these occasions and were quite upset.

12. *Stafford Ross, Jr.,* testified that he is petitioner's brother. He also testified about the violent behavior of his stepfather, Henry, toward their mother and siblings. There was a time in his life when he was smoking "a lot of weed." Petitioner "didn't like that," and attempted to steer Stafford in a different direction. As a result, Stafford became involved in body building and won third place in a Mr. Los Angeles contest.

13. *Gerald Brown* testified that he is Henry Brown's son and petitioner's stepbrother. He was a paramedic with the Los Angeles Fire Department at the time of petitioner's trial. He, too, testified about his father's violence, drinking, and gambling.

14. *Melvin Williams, Jr.,* testified that he is petitioner's cousin. Now a law clerk to a federal district court judge, at the time of trial he was student body president of Fairfax High School and had received an award from the Mayor of Los Angeles as an outstanding youth. He testified that he played with petitioner as a child and liked him.

15. *Gloria Brown,* petitioner's mother, testified that she was employed by the Los Angeles Department of Social Services from 1964 to 1990. Both of her husbands inflicted violence upon her. When she was eight months pregnant with petitioner, Stafford Ross "knocked" her against a wall, causing petitioner to be born prematurely the next day. He also stabbed her when petitioner was three months old. Her second husband, Henry Brown, beat her and the children when he got drunk. When Henry lost money at the race track, it was a "bad scene," for Henry would curse and fight, frightening the children. Gloria did not leave Henry, because he had a good job and she did not want to go on welfare. She was "trying to have a better life for my kids," and she did not realize at the time "that it was really impacting my children." Ultimately she did leave Henry, but they reconciled in 1978, after the children were grown and he had stopped drinking.

Gloria testified that petitioner once was upset because, he told her, an elementary schoolteacher had called him "nigger," which the teacher denied. She had conversations with petitioner's lawyers, but she said they never interviewed her to determine what testimony she could offer at the penalty phase, and never suggested that she testify.

The referee summarized this testimony: "The Referee finds that these witnesses would testify that they love petitioner; would suffer personally if

he were to be sentenced to death; were sincere and that their testimony was such as to inspire confidence, trust, sympathy, and belief; that they were amicable, willing, and anxious to testify now and would have been so in 1982.

"The Referee finds that the petitioner suffered extremely and largely unwarranted physical violence upon himself from both his father and later his stepfather; that he was witness to other violence inflicted upon his mother, brothers, and sisters; that he was without guidance from either his father or stepfather and could be labeled a 'latchkey child'; that he was arbitrarily prevented from having any contact with his stepfather and step-brothers during his formative years and that this violation was extremely distressful to petitioner; that early poverty and a distracted and resentful mother further blunted his development; that such evidence of abuse was believable and would have been found to be significant by the penalty phase jury in 1982.

"The Referee finds true that on four occasions Alvin Williams, the Los Angeles Police Department detective, had to disarm the petitioner's stepfa-ther, Henry Brown, of a .22 revolver and that Brown had threatened to kill Gloria Brown, petitioner's mother, and that the petitioner was witness to all four of these events and was upset and afraid of his stepfather; that Henry Brown was frequently drunk and abusive to his children usually after a losing day at the horse races and that petitioner seemed to get more punishment than the other children and that the beatings were not related to discipline but primarily abuse.

"The Referee finds that the petitioner's family would testify to acts of kindness and protectiveness performed by petitioner; that petitioner was especially protective of younger members of his family when they were going to school or playing; that petitioner would frequently babysit his younger cousins and was playful with them and enjoyed entertaining the youngsters; that generally he was respectful and helpful with the family members; that this testimony could easily be believed by a penalty phase jury.

"The Referee finds that documentary evidence of petitioner's report cards establishes that petitioner had passing grades until the breakup of his family and almost immediately thereafter he began failing all his subjects; [and] that the jury could infer from these facts that petitioner was negatively and severely affected by the family breakup and enforced isolation from his stepbrothers and would find it instructive during the penalty phase.

"The Referee finds that all of this evidence with an abundance of detail not gone into in this report was readily available to the defense team and was not presented by petitioner at his penalty phase trial."

### 2. *"What Investigative Steps by Trial Counsel, If Any, Would Have Led to Such Items of Evidence?"*

Casey Cohen testified that he was retained by appellate counsel to conduct an investigation of witnesses who could have testified on petitioner's behalf at the penalty phase. He telephoned petitioner's mother and told her he would like to interview family members who could have testified on petitioner's behalf. With her help, Cohen was able to interview 15 family members in less than 2 weeks. He spent 15 or 16 hours investigating.

The referee found that "reasonably competent defense counsel in a capital case would have employed investigation prior to trial to interview petitioner's family members and to obtain any institutional, school, medical, hospital or court records of the petitioner. Competent counsel would also have employed the services of mental health professionals to explore possible psychiatric defenses and obtain additional background information regarding childhood experiences, environmental problems, child abuse, educational or intellectual difficulties and other related material that might lead to mitigating evidence in a capital case. [¶] The Referee finds that such investigatory activity is customary and indeed mandatory in a capital case and that such investigative steps would have led to all of the evidence adduced at the reference hearings."

### 3. *"What Investigative Steps, if Any, Did Trial Counsel Take in an Effort to Gather Mitigating Evidence to Be Presented at the Penalty Phase?"*

Two attorneys represented petitioner at trial: Gerald Lenoir, who served as lead counsel, and Elizabeth Harris, who assisted him. Both testified at the reference hearing. The parties stipulated that Lenoir was "an experienced lawyer of some 40 years' practice; has been practicing criminal law exclusively the last 15 or 20 years of his practice; and had been trying, as a defense lawyer, death penalty cases since 1958 during whatever periods the death penalty laws in this state were viable; and that he always tried the best that he could when he tried these lawsuits." "[H]e tried numerous death penalty cases prior to the Craig Anthony Ross case in 1982." Second counsel Harris was less experienced; the referee found that this was her second capital case. Lenoir testified he selected her to aid him because she was a good attorney and because of her performance in an earlier death penalty case.

At the reference hearing, Lenoir, who, since petitioner's trial, had retired, suffered two strokes, and moved to Louisiana, had little memory of petitioner's case. He could not recall what, if any, steps the defense took to learn of

mitigating evidence that could be presented on petitioner's behalf. He testified that in capital cases, he routinely considered the possibility of presenting mitigating evidence of character and background. If "there was cooperation from the client and he permitted it," Lenoir would explore such evidence in each case. He had no reason to believe he had neglected to do so in this case. He also testified that, in the abstract, fear of damaging rebuttal might be a consideration in deciding whether to present character evidence. Absent a tactical reason or instructions from the client, Lenoir testified, he "absolutely" would have presented any favorable character evidence. It was his practice to discuss with his clients the possibility of calling family members to testify on their behalf. In an earlier deposition, Lenoir testified that he had talked with the mother "many times" " 'about the case.' "

Harris testified that petitioner's trial was either her first or her second capital case. To prepare for the penalty phase in petitioner's case, she talked to approximately three family members, one of whom was petitioner's mother. These conversations took place either in the hallway of the courthouse or over the telephone; she never told these individuals the nature of the testimony if they were to be called as witnesses at the penalty phase. She obtained none of petitioner's school, juvenile, or prison records, and never went to petitioner's house to talk to any family members. She and Lenoir discussed the possibility of presenting background evidence at the penalty phase "[p]erhaps just a bit in terms of putting on [petitioner's] mother. Something. But nothing very extensive." She said the decision whether to call witnesses at the penalty phase was Lenoir's, but that if witnesses had been called, she would have been assigned to question them. She and Lenoir never discussed the advisability of calling witnesses at the penalty phase, and never talked about what, if any, rebuttal evidence the prosecution could introduce if they chose to call witnesses; Lenoir simply told her that the defense would not call any witnesses at the penalty phase. Regarding the adequacy of her representation, she said: "I absolutely feel I did not do a competent job at the penalty phase . . . and I'm not happy to say that, but that's true."

The referee admitted into evidence a deposition, taken in 1986, in which Harris testified about her investigation of petitioner's case. At the reference hearing, Harris said her deposition testimony was truthful. In the deposition, Harris said that her primary task in representing petitioner was to prepare for the penalty phase. As part of her preparation, she spoke to an expert on the psychology of gangs, as well as a police officer who testified for the prosecution at the guilt phase of petitioner's trial regarding petitioner's gang activities. She said that she had talked to "a number" of petitioner's family members, including his mother and stepfather, his sister Denise, his stepbrother Michael, and one or two of his aunts.

Charles Watson, who had been retained by Lenoir to investigate petitioner's case, testified that he interviewed two potential penalty phase witnesses, both friends of petitioner. He did not recall what either of these persons had told him. He also said that he spoke on the telephone to petitioner's mother, and, at Lenoir's request, asked her to come to trial during the penalty phase.

The ability of investigator Watson, and Attorneys Harris and Lenoir to recall what steps they took to investigate the case was impaired by the disappearance of the attorneys' files in petitioner's case, which also contained all of Watson's investigation reports. The referee found that these files had "inexplicably been lost or destroyed while under the control of the attorneys." Lenoir testified at the reference hearing, "I moved my office several times, and I lost not only that file but several other files that I never located."

The referee concluded that "absolutely nothing of a competent nature was done by way of penalty phase preparation by defense counsel in this case."

4. *"What Tactical and Financial Constraints, if Any, Weighed Against the Investigation or Presentation of Mitigating Character and Background Evidence at the Penalty Phase?"*

Attorney Lenoir testified that he could not remember whether there were any tactical constraints that weighed against presentation of any family members as penalty phase witnesses on petitioner's behalf. Second counsel, Harris, testified that she did not know why Lenoir had decided not to call any witnesses at the penalty phase, but said that she knew of no financial or tactical constraints that weighed against presenting such evidence.

The referee found that there were no financial constraints that justified counsel's failure to adequately investigate or present evidence on petitioner's behalf at the penalty phase, pointing out that because petitioner was indigent, funds were available to pay necessary defense experts and investigators. The referee also concluded that the "penalty phase preparation was totally inadequate, in fact virtually non-existent," that "there were no legitimate tactical reasons for non-participation in the penalty phase," and that "there was no investigation regarding rebuttal, and this self-inflicted ignorance cannot provide the basis for an informed tactical decision."

5. *"What Evidence Damaging to Petitioner, but Not Presented by the Prosecution at the Guilt or Penalty Trials, Would Likely Have Been Presented in Rebuttal if Petitioner Had Introduced Any Such Mitigating Character and Background Evidence?"*

At the reference hearing, the prosecutor produced evidence which, he argued, he would have introduced at the penalty phase of the trial if the defense had called family members to testify.

At the penalty phase of petitioner's trial, the prosecutor sought permission to introduce evidence of criminal activities that petitioner had engaged in as a juvenile. Petitioner had three sustained delinquency petitions on charges of burglary involving the theft of guns, another involving four counts of robbery, and another for brandishing a fork at a cook while he was at the California Youth Authority. The prosecutor also sought to present evidence of other institutional acts of misconduct. The trial court refused to admit this evidence because some of petitioner's activities did not involve force or violence (see Pen. Code, § 190.3, factor (b)), and also because the prosecutor did not comply with the statutory requirement that he give the defense advance notice that he would use this evidence at the penalty phase (Pen. Code, § 190.3).

At the reference hearing, the prosecutor produced no witness who had an independent recollection of these episodes, but he asked the referee to judicially notice his offer of proof at trial. The referee concluded that if the defense had introduced mitigating evidence at the penalty phase, "in all likelihood," the trial court would have permitted the prosecutor to introduce on rebuttal evidence of the four counts of robbery and of petitioner's "brandishing a weapon based on threatening a probation camp cook with a large serving fork." The prosecutor called several prison guards to testify regarding threats made by petitioner, but none had any memory of the incidents. The referee found that the "institutional witnesses had no memory of petitioner's conduct as depicted in the reports of 1978 and 1979 and [was] of the opinion that their testimony would have been little better in 1982. The four incidents were proportionally minor, considering the volatile conditions that prevailed at [Deuel] Vocational Institute during this period. Three of the incidents involved threats to staff and the fourth indicated that in June of 1978 the petitioner and 2 other black inmates attacked 2 white inmates." The referee did not mention the three burglaries involving the theft of guns.

At the reference hearing, the prosecution also presented evidence that defendant's mother had told a juvenile probation officer in 1973 that petitioner was cooperative at home, but that when he was with his peers he had no control of himself or his behavior. In 1974, she told the probation officer that petitioner had been mischievous from the time he was a child, and that he had a problem with his temper. In 1975, she told the probation officer that she could not control petitioner, and that he "has a hate for whites, shows a great deal of resentment towards all type of people." The prosecution introduced a psychiatric report, prepared for Los Angeles County Juvenile Court proceedings in 1974, when petitioner was 15 years old. According to the report, petitioner told the interviewing psychiatrist that he had never been beaten or physically abused by anyone, that he liked his stepfather,

Brown, and had gotten along well with him, and that he felt better when there was a man at home fulfilling the role of father. Petitioner, who had been held at a camp, said that he wanted to go home. The prosecutor also called the probation officer who prepared a probation report when petitioner assaulted Mark Howard in Helen Keller Park, shooting him six times in the stomach. The officer said petitioner felt no remorse for the assault, and was not concerned about going to prison.

6. *"Did Petitioner Himself Request That Either the Investigation or the Presentation of Mitigating Evidence at the Penalty Phase Be Curtailed in Any Manner?"*

Attorney Harris testified that petitioner had never told her not to call witnesses on his behalf at the penalty phase. Attorney Lenoir testified that he could not recall whether petitioner ever asked that members of his family not be called to testify. In a deposition in 1986, Lenoir said that he "got the impression," either from petitioner or Harris, that petitioner did not want Lenoir to call his mother as a witness.

Attorney Ronald Skyers, who had represented codefendant Champion at trial, testified that during the trial, Lenoir said either that petitioner did not want Lenoir to call his mother as a witness, or that he did not want any relatives to testify. Skyers was not sure which of these two statements Lenoir had made. The referee admitted this hearsay testimony only to show Lenoir's state of mind.

Petitioner did not testify at the reference hearing.

The referee found "no substantial evidence to support any reasonable conclusion that petitioner requested curtailment of the presentation of penalty phase evidence."

7. *Other Findings*

In discussing question No. 5, regarding possible rebuttal evidence, the referee also stated that the rebuttal "evidence would have been outweighed by the petitioner's mitigating evidence and that it is reasonably probable that a more favorable determination would have resulted in the absence of defense counsel's failings to act in the manner to be expected of reasonably competent attorneys acting as diligent advocates." In arriving at this conclusion, the referee considered "the demeanor and credibility of all the witnesses who testified at the reference hearing."

## II. DISCUSSION

### A. *General Legal Principles*

█ The general legal principles are settled. Petitioner had the right to the effective assistance of counsel at trial, and thus was "entitled to the reasonably competent assistance of an attorney acting as his diligent and conscientious advocate." (*In re Marquez* (1992) 1 Cal.4th 584, 602 [3 Cal.Rptr.2d 727, 822 P.2d 435].) A defendant claiming ineffective representation bears the burden of proving by a preponderance of the evidence both (1) that counsel's performance was deficient, i.e., that the representation fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been more favorable to defendant, i.e., a probability sufficient to undermine confidence in the outcome. (*Id.* at pp. 602-603; *People* v. *Mayfield* (1993) 5 Cal.4th 142, 199 [19 Cal.Rptr.2d 836, 852 P.2d 331].)

█ The standard of review of the referee's report is equally settled. Any conclusions of law, or of mixed questions of law and fact, are subject to independent review. Mixed questions include whether counsel's performance was deficient and whether the deficiency prejudiced the defense. Because the referee can observe the demeanor of the witnesses and their manner of testifying, findings of fact, though not binding, are entitled to great weight when supported by substantial evidence. (*People* v. *Mayfield*, *supra*, 5 Cal.4th at p. 199; *In re Marquez*, *supra*, 1 Cal.4th at p. 603.)

### B. *Petitioner's Exceptions to the Referee's Report*

Although the referee's report was generally favorable to petitioner's position, he states five exceptions to that report. To some extent, the exceptions relate to whether counsel's performance was deficient. Because, as explained below, we accept for purposes of discussion that the performance was indeed deficient, and base our ultimate rejection of petitioner's claim on the lack of prejudice, we need not consider the exceptions in that regard. In addition, petitioner disagrees with the report on the following points relevant to prejudice.

1. Petitioner excepts to the report, "[i]n general, to the extent the facts as set forth in this brief differ from or are more extensive than the facts as set forth in the report of the Referee . . . ." He is not more specific. A comparison of petitioner's lengthy factual recitation and the referee's more concise summary shows the former is more exhaustive than the latter, which can always be the case. The referee himself recognized the impossibility of

expressly mentioning every arguably relevant detail when he referred to the "abundance of detail not gone into in this report . . . ." We have no reason to assume the referee failed to consider any significant fact. In any event, we have ourselves reviewed the record and draw our own conclusions. This does not state a valid exception.

2. Petitioner "takes exception to the ruling of the Referee on admissibility of the testimony of James Coburn, and accordingly on the failure of the Referee to make findings on all matters as to which Dr. Coburn would have testified." This apparently refers to an earlier argument in petitioner's brief stating, in its entirety, that "had [Dr. Coburn's] testimony been allowed by the Referee, he would have testified that [petitioner's] anti-social behavior in an institutional setting as purportedly shown by the People in rebuttal, was a reflection of failure of the juvenile justice system to provide treatment and counseling . . . ." At the reference hearing, petitioner attempted to have a psychiatrist testify that petitioner's institutional misbehavior was, in essence, the fault of the juvenile justice system. We have reviewed the record, and find no abuse of discretion by the referee's sustaining a relevance objection. Moreover, in his report, the referee discounted some of the institutional incidents in part because they were "proportionally minor, considering the volatile conditions that prevailed at [Deuel] Vocational Institute during this period." Even if we assume that petitioner could have presented such evidence at a trial to rebut the available prosecution rebuttal evidence, it would not change our ultimate conclusion.

3. Petitioner "takes exception to the ruling of the Referee on admissibility of the testimony of Robert Bryan, and accordingly on the failure of the Referee to make findings on all matters as to which Mr. Bryan would have testified." Bryan is an attorney whose testimony related largely to the issue of counsel's performance. Regarding prejudice, petitioner questioned Bryan whether, in his opinion, evidence of child abuse might affect the jury's penalty determination. Over objection, the court generally allowed the testimony. In Bryan's opinion, such testimony can be very helpful to the defense. Bryan discussed, among other things, public opinion surveys supporting this opinion. Petitioner also asked whether the witness had "an opinion as to whether these deficiencies [of trial counsel] that you've just noted were prejudicial to Mr. Ross." Noting that the question "goes beyond the six questions [this court asked in the reference order]," the referee sustained an objection to the question. But petitioner then asked if the witness had "an opinion based upon the deficiencies that you've just noted that there is a reasonable probability that the outcome would have been different?" This time, there was no objection, so the court allowed the witness to answer. Bryan said that in his opinion, "the result very likely would have been different," and stated reasons for this opinion.

Petitioner does not make clear exactly what rulings he disagrees with. As noted, the referee, correctly or incorrectly, eventually did allow the witness to express an opinion on the question of prejudice. The referee did not expressly mention this testimony in his report, but there is no reason to suppose he did not consider it for what it was worth. Moreover, as discussed below, the referee was correct that the ultimate question of prejudice was not before him. The referee made no erroneous rulings of which petitioner can complain.

4. Petitioner "takes exception to the ruling of the Referee refusing to permit Petitioner to establish that intent was not proven with respect to the sustained juvenile robbery petitions and that accordingly those petitions are irrelevant as rebuttal and not legally sustained." He supplies no record citation and does not further develop his complaint. We therefore need not consider it. (*People* v. *Ashmus* (1991) 54 Cal.3d 932, 985, fn. 15 [2 Cal.Rptr.2d 112, 820 P.2d 214].) Moreover, at most it appears this would go to the weight of the rebuttal evidence, not its admissibility.

5. Petitioner "takes exception to the finding of the Referee, completely unsupported by the evidence, that the People would have had available in 1982 the rebuttal evidence they presented in these proceedings or that the Superior Court would have ruled it admissible." This refers to the fact the respondent relied primarily on the offer of proof made at the trial itself and documentary evidence to show the rebuttal evidence. The referee did discount much of the proffered rebuttal evidence because of this. Petitioner appears to claim that no rebuttal evidence whatsoever would have been available. We have reviewed the record, and conclude that substantial evidence supports the finding that the rebuttal evidence the referee cited would have been available in 1982. Petitioner's legal arguments regarding this evidence will be discussed below.

## C. *Respondent's Exceptions to the Referee's Report*

Respondent, represented in this court by the Attorney General, states a number of exceptions to the report. In light of our ultimate conclusion that petitioner is not entitled to relief, we need not consider all the exceptions. Some, however, are meritorious.

1. The referee found "that the petitioner suffered extremely and largely unwarranted physical violence upon himself from *both his father* and later his stepfather . . . ." (Italics added.) The Attorney General notes that petitioner's parents separated when he was about three months old and that there was no evidence petitioner suffered direct physical violence by his

natural father. There was only some indication, although no medical evidence, that petitioner might have been the indirect victim of the father's violence upon his mother when she was pregnant with petitioner. We therefore reject this finding to the extent it implies more than that petitioner might have indirectly suffered from the violence the natural father inflicted upon the mother.

2. The referee found that petitioner "was arbitrarily prevented from having any contact with his stepfather and stepbrothers during his formative years . . . ." The Attorney General correctly argues that although there was evidence the stepfather did not want petitioner to see his stepbrothers, it was clear that petitioner did, in fact, continue to have contact with them. We will view the referee's finding in this light.

3. The referee found that "early poverty and a distracted and resentful mother further blunted his development . . . ." The Attorney General disagrees, correctly noting that there was little evidence of actual poverty, and that what poverty there was occurred when petitioner was very young. Also, there was no direct evidence that petitioner's development was blunted, only inferences that it must have been. Indeed, evidence of petitioner's good behavior might suggest the opposite. Again, we will view the referee's finding in this light.

4. The Attorney General disagrees with the referee's finding that "documentary evidence of petitioner's report cards establishes that petitioner had passing grades until the breakup of his family and almost immediately thereafter he began failing all his subjects; [and] that the jury could infer from these facts that petitioner was negatively and severely affected by the family breakup and enforced isolation from his stepbrothers . . . ." We have examined the evidence and agree that petitioner's grades do not support this finding.

## D. *Analysis of Referee's Findings*

The referee opined that defense counsel failed "to act in the manner to be expected of reasonably competent attorneys acting as diligent advocates." Nearly nine years elapsed between the trial and the reference hearing, and memories had dimmed, making it difficult to determine exactly what counsel did and did not do. However, we need not decide whether counsel's performance was truly deficient, or merely obscured by the fog of time. Instead, we turn first to the question of prejudice. Finding no prejudice, we do not address the question of counsel's performance. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 697 [80 L.Ed.2d 674, 699-700, 104 S.Ct. 2052]; *In re Fields* (1990) 51 Cal.3d 1063, 1079 [275 Cal.Rptr. 384, 800 P.2d 862].)

The referee responded to the six specific *factual* questions we posed in the reference order, but also answered some questions we did not ask, including the ultimate one: whether petitioner was prejudiced by counsel's performance. Our failure to ask that question was deliberate, for it is of mixed law and fact for our resolution. As explained in *In re Cordero* (1988) 46 Cal.3d 161, 171, footnote 1 [249 Cal.Rptr. 342, 756 P.2d 1370], our reference orders formerly asked the referee to answer ultimate legal questions, and not merely find the facts. ■ "We have now determined, however, that a referee should be asked only to make findings on disputed factual issues, and not to resolve legal issues arising from those facts." (*Ibid.*) ■ The record of the reference hearing indicates the referee did not review the trial record. Such review was not necessary to resolve the factual questions we posed, so the referee acted appropriately. ■ However, "[t]o determine whether prejudice has been established, we compare the actual trial with the hypothetical trial that would have taken place had counsel [performed] competently . . . . [Citation.] This requires knowledge of all of the evidence that was presented at trial, not just the evidence that was presented at the habeas corpus hearing. ■ Since the referee had not made a full review of the evidence that was presented at trial, we do not find his recommendation persuasive." (*In re Marquez, supra,* 1 Cal.4th at p. 604.)

The question before us is whether, had the mitigating evidence presented at the reference hearing been presented at trial, it is reasonably probable the outcome would have been different. We conclude not. The mitigating evidence consisted of the testimony of 15 members of petitioner's family testifying primarily that they loved petitioner, that he was protective and caring to other family members, and that he was abused as a child by his stepfather, Henry Brown, especially when Brown had been drinking or at the racetrack. There was also testimony that petitioner lived in a violent neighborhood, that his failure to be rehabilitated was partly the fault of institutional authorities, and that he expressed remorse for his earlier crimes. The referee found that these witnesses "were sincere and that their testimony was such as to inspire confidence, trust, sympathy, and belief . . . ." We accept this finding.

As noted above, some of the trial court's findings regarding the mitigating evidence are not supported by substantial evidence, and we reject those. The mitigating evidence was, to this extent, somewhat weaker than the referee found. But, in sum, the mitigating evidence was substantial. If it stood alone, we may well have found that petitioner had established prejudice. (See *In re Marquez, supra,* 1 Cal.4th at pp. 605-609.) But it does not stand alone. The mitigating evidence was subject to substantial impeachment and potentially devastating rebuttal. This alters the equation.

The mitigating evidence would have been weakened by two significant areas of impeachment. First, according to a psychiatric report prepared when petitioner was 15 years old, petitioner told the psychiatrist that he had never been beaten or physically abused by anyone, he liked and got along well with Brown, and he felt better when there was a man at home fulfilling the role of father. Petitioner presented testimony that it is common for an abused child to deny the abuse, and argues that because he had been institutionalized for a long time and wanted to go home, he had a motive to minimize problems in his home life. The defense could certainly have presented this evidence and this argument, but petitioner's own words, more contemporaneous to the alleged incidents than the later testimony of his relatives, would have made effective impeachment. Moreover, at the time of trial, petitioner's mother and Brown, the person who allegedly abused her and petitioner so seriously that it had an effect on his becoming a murderer, had reconciled and were once again living together. Although abused persons often become reconciled with the abuser, and the mother testified that Brown had changed his ways, the combination of petitioner's words and the mother's living with Brown at the time of trial, would certainly have weakened the impact of the abuse evidence.

Also impeaching would have been statements by the mother herself long before the trial, and thus closer in time to the events at issue. In 1973 (petitioner was born in 1959), the mother told a juvenile probation officer that petitioner was cooperative at home, but that when he was with his peers he had no control of himself or his behavior. This would have undercut the mitigating evidence relating to petitioner's behavior, which was limited to his behavior at home, i.e., with his relatives. Moreover, in 1974, the mother told the officer that petitioner had been mischievous from the time he was a child, and that he had a problem with his temper. In 1975, she said petitioner "has a hate for whites, shows a great deal of resentment towards all type of people."

In addition to being impeachable in this fashion, the mitigating evidence would have triggered damaging rebuttal. At the actual trial, in 1982, the prosecution sought to present much more aggravating evidence than the court allowed, primarily evidence of criminal conduct while petitioner was a juvenile. When defense counsel objected, the court refused to allow the evidence partly because of insufficient statutory notice of aggravating evidence and partly because some of the evidence did not come within one of the statutory aggravating factors. (Pen. Code, § 190.3.) As a result, the jury heard no evidence of misconduct by petitioner before he was 18 years old, and none at all in a custodial setting.  ██ ██  Rebuttal evidence, however, "is not subject to the notice requirement of section 190.3 and need not

relate to any specific aggravating factor under section 190.3." (*People* v. *Mitcham* (1992) 1 Cal.4th 1027, 1072-1073 [5 Cal.Rptr.2d 230, 824 P.2d 1277].)

The referee found that "in all likelihood" the trial court would have permitted rebuttal by petitioner's juvenile records. This included "sustained juvenile petitions for four counts of robbery and one for brandishing a weapon based on threatening a probation camp cook with a large serving fork." The referee also found that the prosecution probably could not have presented evidence of misconduct at Deuel Vocational Institute in 1978 and 1979 that was memorialized in written reports because the "institutional witnesses had no memory [at the reference hearing] of petitioner's conduct as depicted in the reports of 1978 and 1979 and [was] of the opinion that their testimony ·would have been little better in 1982." We accept this finding, although we question the assumption that what could not be proven at the reference hearing in 1991 because of the passage of time could equally not have been proven at trial in 1982. The referee did not mention three additional sustained petitions on charges of burglary involving the theft of guns. Especially in light of the prosecution offer of proof at trial, we see no reason to doubt the availability of this documentary evidence in 1982.

Petitioner argues that this evidence would not have constituted proper rebuttal. He is correct that penalty phase rebuttal evidence "must relate directly to a particular incident or character trait defendant offers in his own behalf." (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 792, fn. 24 [230 Cal.Rptr. 667, 726 P.2d 113].) However, we conclude that this evidence would have been admissible to rebut evidence portraying petitioner as a kind, protective, caring person.

In *People* v. *Rodriguez, supra*, 42 Cal.3d at pages 791-792, and footnote 24, for example, evidence presented "through family members that [the defendant] was gentle and in the habit of avoiding violent confrontations" was properly rebutted by evidence that the defendant once reached for a shotgun when stopped by a police officer. "Once appellant placed his general character in issue, the prosecutor was entitled to rebut with evidence or argument suggesting a more balanced picture of his personality." (*Id.* at p. 791, and quoted in *People* v. *Daniels* (1991) 52 Cal.3d 815, 883 [277 Cal.Rptr. 122, 802 P.2d 906] [allowing rebuttal by evidence of nonviolent crimes including receiving stolen property, malicious mischief, truancy, and traffic violations].) In *People* v. *Mitcham, supra*, 1 Cal.4th at page 1072, we upheld rebuttal evidence of a wide variety of juvenile misconduct. "The rebuttal evidence of defendant's acts of delinquency, including incidents of violence, directly related to this general picture of a well-behaved youth

presented by the defense. Although we cautioned in *Rodriguez* that 'the scope of rebuttal must be specific, and evidence presented or argued as rebuttal must relate directly to a particular incident or character trait defendant offers in his own behalf' (42 Cal.3d at p. 792, fn. 24), here defendant's good character evidence was not limited to any singular incident, personality trait, or aspect of his background. The defense evidence painted an overall picture of an honest, intelligent, well-behaved, and sociable person incompatible with a violent or antisocial character. The breadth and generality of this good character evidence warranted rebuttal evidence of the scope offered. (Cf. *People* v. *Ramirez* (1990) 50 Cal.3d 1158, 1192-1193 [270 Cal.Rptr. 286, 791 P.2d 965].)" (*Ibid.*)

In *People* v. *Ramirez* (1990) 50 Cal.3d 1158 [270 Cal.Rptr. 286, 791 P.2d 965], the rebuttal evidence was found improper. There, the defense witness being rebutted, the defendant's mother, "did *not* testify generally to defendant's good character or to his general reputation for lawful behaviors, but instead testified *only* to a number of adverse circumstances that defendant experienced in his early childhood . . . ." (*Id.* at p. 1193, italics added.) Because of this, we concluded that the rebuttal evidence not relevant to the adverse circumstances was improperly admitted. (*Ibid.*; see also *In re Jackson* (1992) 3 Cal.4th 578, 613-614 [11 Cal.Rptr.2d 531, 835 P.2d 371].) By contrast, here, as in *Mitcham*, there *was* good character evidence in addition to evidence of petitioner's mistreatment. The other crimes evidence would clearly have been proper rebuttal to this evidence.

At the reference hearing, counsel for petitioner limited his evidence of petitioner's acts of kindness to the period before petitioner was a teenager, and argued that the prosecution could not use his later delinquent acts for purposes of impeachment. He continues to argue in this court that the defense could have prevented the rebuttal by carefully having the character witnesses refer only to petitioner as a young child, before he committed any of his juvenile crimes. Even if legally correct, this would have made a very awkward defense case in mitigation. It would be difficult to hide from the jury that the defense evidence was painfully limited to a very young petitioner. The jury may well wonder what, exactly, the defense was hiding. We question how effective it would be for the defense to present a parade of witnesses testifying about petitioner's good qualities up to sometime around the age of 12 years, but necessarily leaving an obvious gap during his teen years. The argument also fails legally. As explained above, the purpose of rebuttal in this context is to present a more balanced picture of the defendant's personality. Evidence that petitioner was a good child, but committed various acts of misconduct as a teenager and then as an adult, presents a more balanced picture than evidence that petitioner was a good child, then

later committed adult crimes, deleting accurate evidence of petitioner's juvenile record. Character evidence cannot be parsed so finely.

Petitioner argues that evidence of the sustained juvenile petitions, as distinct from the criminal behavior itself, was not admissible. The argument fails because this evidence was to be used as rebuttal. "That the juvenile court adjudications and declaration of wardship were not necessarily evidence of criminal activity involving force or violence under factor (b), or prior felony convictions under factor (c) of section 190.3, is therefore irrelevant. [Citation.] Furthermore, that the juvenile misconduct did not result in criminal convictions is similarly irrelevant. The rebuttal evidence was not necessarily offered to establish past criminal activity on defendant's part but rather to rebut defendant's claim of good character. [Citation.] The prosecution's evidence was highly probative of defendant's character as a juvenile . . . ." (*People* v. *Mitcham, supra,* 1 Cal.4th at p. 1073.)

Moreover, at the reference hearing, the respondent sought to present testimony by the robbery victims themselves. The referee refused to allow such testimony, stating that the hearing "is not a trial. And I think what the Supreme Court is interested in is the kind of material that you at trial, with arguably more resources at your disposal, would be able to present. You put on a [bare] bones, and I imagine it would be flushed out at trial . . . ." In light of this, and the prosecution offer of proof at the actual trial, there is no reason to suppose evidence of the crimes themselves could not have been presented; because petitioner did not argue respondent had to present the live witnesses at the hearing when the referee refused to allow it, he should not now be heard to argue they would not have been available.

We thus find that the mitigating evidence was readily impeachable by the mother's and petitioner's own words and actions and would have triggered strong rebuttal. We must also consider the record of what counsel *did* do at trial. Counsel "did not simply give up" (*People* v. *Miranda* (1987) 44 Cal.3d 57, 121 [241 Cal.Rptr. 594, 744 P.2d 1127]), but had a specific tactical approach, and presented evidence and argument to support this approach. Defense counsel gave the penalty jury a reason to spare defendant's life. As we found in the direct appeal, and contrary to petitioner's argument, the jury was not misled into believing the weighing of aggravating and mitigating factors was a mechanical process or that they had to impose the death penalty even if they did not consider it the appropriate punishment under all the circumstances. (*People* v. *Champion, supra,* 9 Cal.4th at pp. 947-948.)

Defense counsel presented no witnesses at the penalty phase, but argued mitigating inferences from the guilt phase evidence presented by the prosecution (see *People* v. *Sanders* (1990) 51 Cal.3d 471, 527 [273 Cal.Rptr. 537,

797 P.2d 561] ["The jury could . . . have found mitigating factors from evidence presented at the guilt phase."]), and presented three items of evidence through stipulation and judicial notice: (1) Jerome Evan Malett, an accomplice in the Taylor murder and related crimes, as to whom the jury found true a personal firearm *use* enhancement (only a vicarious arming enhancement was found true as to petitioner), did not receive the death penalty; (2) Mark Howard, the victim of the only aggravating crime presented at the penalty phase against petitioner, was an ex-gang member; and (3) petitioner was only 21 years old at the time of the murders. This is certainly not much, but it presented a coherent case, and avoided the impeachment and rebuttal the new mitigating evidence would have elicited.

We have held that evidence of the disposition of accomplices is not proper mitigating evidence. (*People* v. *Belmontes* (1988) 45 Cal.3d 744, 811 [248 Cal.Rptr. 126, 755 P.2d 310].) Therefore, had there been an objection, the evidence that Malett received a life sentence could undoubtedly have been excluded. But that does not mean we cannot consider the evidence when evaluating the question of prejudice. *Belmontes* was decided well after this trial. Whether the trial court could have, or should have, excluded this evidence had there been an objection is beside the point because the defense did successfully present the evidence, and the jury was allowed to consider it. This evidence was weakened by the fact that Malett was convicted only of one murder and the jury found not true an allegation that he personally inflicted great bodily injury, but Malett was also the only one found to have personally used a firearm in the crime. Although this split verdict did not completely resolve the question, the defense was able to argue that it suggested that Malett, and not petitioner, was the actual shooter.

Counsel carried through on this evidence in his penalty phase argument to the jury. "Trial counsel in argument attempted at length to dissuade the jury from imposition of the death penalty." (*People* v. *Jackson* (1980) 28 Cal.3d 264, 314 [168 Cal.Rptr. 603, 618 P.2d 149].) Counsel stressed eloquently the harshness of a punishment of life without possibility of parole. He then discussed the Malett case, and contrasted the finding that Malett personally used a firearm with the failure to even charge firearm use as to petitioner. He argued that the district attorney "concede[d]" he could not prove petitioner personally used a firearm.

Counsel then turned to the mitigating factors. In an argument of special import now, counsel stated, "You can reasonably infer that Mr. Ross behaved during the two years he was in prison [for the assault on Mark Howard]. *There is nothing to show otherwise.* There is nothing, and you can rest assured as diligent as [the prosecutor] has been in this case . . . in

marshaling of evidence if there was one black mark on Ross' record while he was in confinement it would have been presented to you." (Italics added.) Counsel stated that this supposed good behavior in confinement was a "mitigating circumstance," then continued: "Now, when we talk about mitigating circumstances and aggravating circumstances it's not the number, because one mitigating circumstance can be sufficient. One can be sufficient. So, we have one there. *Some people cannot conform unless they are in a confined environment, and he has proven that he can do that.*" (Italics added.) This argument, a potentially compelling one when the jury must decide whether the defendant should spend the rest of his natural life in a "confined environment," could not have been made if counsel had produced the mitigating evidence suggested in this proceeding and triggered the rebuttal evidence that petitioner had a sustained juvenile petition "for brandishing a weapon based on threatening a probation camp cook with a large serving fork."

Counsel argued petitioner's age was mitigating, then discussed a mitigating circumstance of the crime, and mitigating facts of the Howard assault, including the victim's gang membership. He stressed that while an aider and abettor is guilty of the crime, the actual "man with the gun" is "primarily" the one the law is designed for, and there is no evidence petitioner "had a gun at any time during these actions." This, counsel argued, was another mitigating circumstance. He then again contrasted Malett's fate with petitioner's, and urged the jury, "based on the evidence and the mitigating circumstances that I have pointed out to you," to return a verdict of life.

All of these circumstances would have justified a decision not to use the additional evidence presented at the reference hearing even after full investigation, and must be considered in deciding whether it is reasonably probable the result would have been different had the evidence been presented.

The leading federal decision regarding ineffective assistance of counsel in a capital case is *Strickland* v. *Washington, supra,* 466 U.S. 668, where the high court found defense counsel made a reasonable tactical choice to rely on limited mitigation presented at a plea colloquy when it ensured that defendant's criminal history would not come in. (*Id.* at p. 699 [80 L.Ed.2d at pp. 700-701].) The court developed this theme in *Burger* v. *Kemp* (1987) 483 U.S. 776 [97 L.Ed.2d 638, 107 S.Ct. 3114]. There, defense counsel presented no mitigating evidence whatsoever, and conducted only a limited investigation. (*Id.* at pp. 789-791 [97 L.Ed.2d at pp. 654-655].) Evidence could have been presented, but was not, disclosing that the defendant had "an exceptionally unhappy and unstable childhood." (*Id.* at p. 789 [97 L.Ed.2d at p. 654].) Although the court found that the "record at the habeas

corpus hearing does suggest that [defense counsel] could well have made a more thorough investigation than he did," it relied on language from *Strickland* v. *Washington, supra,* 466 U.S. at pages 690-691 [97 L.Ed.2d at page 657], that " 'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation,' " and concluded "that counsel's decision not to mount an all-out investigation into petitioner's background in search of mitigating circumstances was supported by reasonable professional judgment." (483 U.S. at p. 794 [97 L.Ed.2d at p. 657].)

The United States Court of Appeals for the Ninth Circuit applied these principles in *Campbell* v. *Kincheloe* (9th Cir. 1987) 829 F.2d 1453, another capital case where defense counsel presented no mitigating evidence. The court stressed that lead counsel was "very experienced," and found that he reasonably chose not to present mitigating evidence to avoid opening the door to a "vast array of aggravating evidence in rebuttal." (*Id.* at pp. 1463, 1462.) Of greater pertinence here, because "some of [the defendant's] potential mitigating evidence would have met with strong rebuttal evidence from the state," and because of the strength of the aggravating factors and the heinous nature of the crime, the court found "no reasonable likelihood that the jury's verdict would have been different had the mitigating evidence been introduced." (*Id.* at p. 1464.)

California cases are to similar effect. In *People* v. *Miranda, supra,* 44 Cal.3d at pages 118-123, we rejected a claim of ineffective assistance for the failure to present mitigating evidence. Citing *Strickland* v. *Washington, supra,* 466 U.S. 668, we saw "no basis in either law or reason to find defense counsel incompetent when he refrains from presenting mitigating evidence as a result of an informed tactical decision, so long as such decision is within the range of reasonable competence." (44 Cal.3d at p. 121.) We also found no prejudice. "[T]he information an investigation would have disclosed would only have confirmed counsel's tactical decision not to open the 'Pandora's Box' of defendant's violent background. . . . On this record, defendant has failed to meet his burden to show that counsel's omission, if error, was prejudicial." (*Id.* at pp. 122-123, fn. omitted.) In *People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1251 [275 Cal.Rptr. 729, 800 P.2d 1159], we stated that the "prosecution may rebut mitigating penalty evidence with unfavorable revelations about the defendant. In rebuttal, the prosecution is bound neither by its statutory pretrial notice of aggravating evidence [citation] nor by the aggravating factors set forth in the statute. [Citations.] The possibility of damaging rebuttal is a necessary consideration in counsel's decision whether to present mitigating evidence about the defendant's character and background." Applying these principles, we found that "even if

counsel should have done more preliminary investigation, his ultimate decision not to *present* a character and background defense is constitutionally supportable." (*Id.* at p. 1253, italics in original.)

In *In re Jackson, supra,* 3 Cal.4th at page 612, we found that "trial counsel, by failing to conduct a reasonable investigation of defendant's background and childhood to enable him to make an informed decision as to the best manner of proceeding at the penalty phase, failed to provide competent representation under the prevailing professional standards." However, we found no prejudice. "[A]s part of the prejudice determination in this case, we must determine whether counsel's representation would have been constitutionally deficient if, for the tactical purpose expressed at the reference hearing, counsel had refrained from introducing the evidence that would have been discovered by a reasonable investigation." (*Id.* at p. 613.) We concluded that "had counsel conducted such an investigation and discovered the evidence that ultimately was presented at the reference hearing, counsel nonetheless would have refrained, for tactical reasons, from introducing such evidence at the penalty phase. . . . [S]uch a tactical decision would not have constituted deficient representation. Accordingly, there is no reasonable probability that the judgment as to penalty was affected by counsel's failure to conduct such an investigation." (*Id.* at p. 616.)

Here, of course, because of a lack of memory, Attorney Lenoir could not testify specifically about his tactical decisions in this case, and, unlike *In re Jackson, supra,* 3 Cal.4th 578, there is no direct evidence that the attorneys would not have presented the mitigating evidence, had they known of it, because of tactical reasons. The testimony of Harris suggests the opposite. But even if we assume counsel *would* have presented the evidence, we conclude, after comparing the trial as it actually occurred with the trial as it would have been with the mitigating evidence, that there was no prejudice. (*Campbell* v. *Kincheloe, supra,* 829 F.2d at p. 1464.)

Petitioner was convicted of three murders on two separate occasions, including the cold-blooded killing of a father and fourteen-year-old son, who were shot while lying on a bed, one with his hands tied behind his back. He personally raped the sister of the third murder victim. Although the additional mitigating evidence, had it been presented, might have evoked sympathy, there was no compelling connection between that evidence and the crimes of this case. The crimes were gang-conducted robbery murders, not sudden explosions of angry violence or psychopathic serial killings. Moreover, the mitigating evidence would have elicited damaging impeachment and rebuttal evidence, with an inevitable adverse effect on the actual defense strategy at trial. For all these reasons, we find no reasonable probability the result would have been different had the mitigating evidence been presented.

We reached a similar conclusion, for similar reasons, in *People* v. *Mayfield, supra,* 5 Cal.4th at pages 207-209, which also involved heinous crimes and mitigating evidence presented at a reference hearing that would have elicited "devastating" impeachment and rebuttal. (*Id.* at p. 207.) As in that case, we are "unable to conclude that, if trial counsel had undertaken the exhaustive and laborious efforts his appellate counsel have for the reference hearing, there is a reasonable probability the result would have been different." (*Id.* at pp. 208-209.)

The case of *In re Marquez, supra,* 1 Cal.4th 584, where we found counsel's failure to investigate and present available mitigating evidence was prejudicial, is distinguishable. In that case, no penalty phase evidence whatsoever was presented by either side, although substantial mitigating evidence was available to the defense. Instead, "[w]hen the time came for defense counsel to argue mitigation, counsel merely said he had 'nothing more' to add." (*Id.* at p. 607.) Moreover, there was no indication the mitigating evidence would have triggered damaging rebuttal. Indeed, *Marquez* itself distinguished its facts, and the facts of "similar" federal cases, from "those cases in which counsel's action was the result of a reasonable tactical decision . . . ." (*Ibid.*) In finding prejudice, we also cited "the relatively spare aggravating evidence—there was no proof of prior convictions or of uncharged acts of criminal violence . . . ." (*Id.* at p. 609.) This case differs from *Marquez* in these important respects, and is more similar to the cases cited above that found either no deficient performance or no prejudice, or both, in failing to investigate or present mitigating evidence.

■ Petitioner argues that "counsel's unexplained loss or destruction of their trial files requires that they be presumed to have been guilty of ineffective assistance in this case." He claims that because the trial attorneys themselves lost the records, "there is every reason to shift the burden of proof [to them] to demonstrate that they were not guilty of ineffective assistance." The argument seems mostly directed to the performance prong of ineffective assistance of counsel claims, rather than prejudice, but either way lacks merit. The burden of proof is on the person challenging counsel's performance (*In re Marquez, supra,* 1 Cal.4th at pp. 602-603); the fact counsel lost the records does not change this. Moreover, petitioner's argument seems to assume that the trial attorneys are parties to this action. They are not. Although ineffective assistance of counsel claims, by their nature, place prosecutors in the position of having to defend the defense attorneys, the respondent here is the custodial authority and, in ultimate effect, the People, not the trial attorneys. Respondent must not be bound by what defense counsel does.

■ Petitioner also argues that, in determining prejudice, we must consider the opinion of Attorney Bryan that counsel's deficient performance

was prejudicial, and his testimony regarding the behavior of juries, including the public opinion surveys he cited. Although the referee generally allowed this testimony, he correctly noted that it was not within the scope of the six factual questions we posed in the reference order. The question of prejudice is inherently fact and case specific; it is for *courts* to decide after reviewing the facts of the specific case, and is not based upon expert witnesses called by either party or testimony about what hypothetical juries may do in hypothetical situations. The instant prejudice determination is similar to prejudice determinations courts routinely make on direct appeal without expert testimony. Although we have considered the testimony in this case for what it was worth (the witness, like the referee, apparently did not review the trial record), we reject the contention that we *must* consider it, or that referees are required to allow it.

### III. CONCLUSION

As in *Burger* v. *Kemp, supra,* 483 U.S. at pages 795-796 [97 L.Ed.2d at page 657], where counsel presented no mitigating evidence, petitioner " 'has made no showing that the justice of his sentence was rendered unreliable by a breakdown in the adversary process caused by deficiencies in counsel's assistance.' "

Accordingly, the order to show cause, issued December 17, 1987, in this proceeding, is discharged, and the petition for writ of habeas corpus is denied.

Lucas, C. J., Baxter, J., George, J., and Werdegar, J., concurred.

**MOSK, J.**—I dissent.

It is now plain from proof dehors the record what was formerly only suggested—albeit unmistakably—by the record itself. In contravention of the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution, petitioner suffered constructive denial of counsel bearing on the sentence of death. Various assertions by their apologists among the majority notwithstanding, trial counsel cannot easily be absolved. Their performance in preparation for, and during the course of, the penalty phase was not merely deficient; it was virtually nonexistent. Their failings " 'resulted in a breakdown of the adversarial process at trial; that breakdown establishes a violation of [petitioner's] federal and state constitutional right to the effective assistance of counsel; and that violation mandates [vacation] of [his death sentence] even in the absence of a showing of specific prejudice.' " (*People* v. *Berryman* (1993) 6 Cal.4th 1048, 1082,

fn. 11 [25 Cal.Rptr.2d 867, 864 P.2d 40], quoting *People* v. *Visciotti* (1992) 2 Cal.4th 1, 84 [5 Cal.Rptr.2d 495, 825 P.2d 388] (dis. opn. of Mosk, J.).)[1]

Accordingly, I would set aside the sentence of death.

**KENNARD, J.,** Dissenting.—In this case, petitioner's two attorneys offered no evidence on his behalf at the penalty phase of his capital trial, leaving the jury's judgment of death a foregone conclusion. Following petitioner's application for a writ of habeas corpus, this court issued an order to show cause and an order of reference.

The evidence at the reference hearing disclosed only too clearly why petitioner's trial counsel had failed to present evidence at the penalty phase: counsel's investigative efforts, which were wholly inadequate, left counsel with no mitigating evidence to offer. At the reference hearing, petitioner presented a host of witnesses, all of whom stated that they would have been willing to testify on petitioner's behalf at trial, but that they were never asked to do so. An investigator for petitioner's appellate counsel was able to locate all of these witnesses in less than two weeks, yet trial counsel spoke to almost none of them. Based on the evidence presented at the reference hearing, the referee, an experienced trial judge, found that trial counsel had ineffectively represented petitioner. In the referee's words, "nothing, absolutely nothing of a competent nature was done by way of penalty phase preparation by defense counsel in this case." The referee concluded that the ineffective representation had been prejudicial to petitioner.

The majority sidesteps the question whether the representation that petitioner received at the penalty phase was inadequate, because it concludes

---

[1]Separately and independently, petitioner's sentence of death should be vacated as unreliable under the Eight Amendment to the United States Constitution and article I, section 17 of California Constitution because counsel introduced virtually none of the available evidence in mitigation. (See *People* v. *Stansbury* (1995) 9 Cal.4th 824, 835 [38 Cal.Rptr 2d 394, 889 P.2d 588] (con. & dis. opn. of Mosk, J.), reiterating *People* v. *Stansbury* (1993) 4 Cal.4th 1017 [17 Cal.Rptr.2d 174, 846 P.2d 756] (conc. & dis. opn. of Mosk, J.) [implying that any sentence of death should be set aside as unreliable under the Eighth Amendment and article I, section 17 if defense counsel failed to introduce any available evidence in mitigation whatsoever], revd. *sub nom. Stansbury* v. *California* (1994) 511 U.S. __ [128 L.Ed.2d 293, 114 S.Ct. 1526]; *People* v. *Diaz* (1992) 3 Cal.4th 495, 577 [11 Cal.Rptr.2d 353, 834 P.2d 1171] (conc. & dis. opn. of Mosk, J.) [same]; see also *People* v. *Howard* (1992) 1 Cal.4th 1132, 1197 [5 Cal.Rptr.2d 268, 824 P.2d 1315] (conc. & dis. opn. Mosk, J.) [finding a verdict of death unreliable under the Eighth Amendment and article I, section 17 when available mitigating evidence was not introduced]; *People* v. *Sanders* (1990) 51 Cal.3d 471, 531-533 [273 Cal.Rptr. 537, 797 P.2d 561] (dis. opn. of Mosk, J.) [same]; *People* v. *Lang* (1989) 49 Cal.3d 991, 1059-1062 [264 Cal.Rptr. 386, 782 P.2d 627] (conc. & dis. opn. of Mosk, J.) [same]; *People* v. *Williams* (1988) 44 Cal.3d 1127, 1158-1161 [245 Cal.Rptr. 635, 751 P.2d 901] (conc. & dis. opn. of Mosk, J.) [to similar effect under the Eighth Amendment]; *People* v. *Deere* (1985) 41 Cal.3d 353, 360-368 [222 Cal.Rptr. 13, 710 P.2d 925].)

that any possible inadequacy was harmless. In the majority's view, had the evidence in mitigation that petitioner offered at the reference hearing been presented at the penalty phase of his capital trial, it would have been seriously weakened by the prosecution's evidence in rebuttal. Thus, the majority asserts, defense counsel's failure to offer any mitigating evidence at trial could not have affected the outcome of the case.

I cannot agree. In my view, the prosecution's rebuttal evidence would have done little to weaken petitioner's substantial evidence in mitigation. I cannot say with confidence that if the jury at the penalty phase had been given such evidence, it would have returned a verdict of death. I would therefore grant the petition for writ of habeas corpus.

## I

The evidence at the guilt phase of petitioner's trial showed that petitioner and three companions burglarized the home of Bobby Hassan, a marijuana dealer, and ransacked the house. They shot Bobby and his son, Eric Hassan, in the head while the victims were lying on a bed, killing both; Bobby's hands were tied behind his back.

The evidence also showed that petitioner and two other young men entered the home of Michael, Cora, and Mary Taylor and robbed the occupants, while a fourth accomplice waited outside. Petitioner forced Mary Taylor to enter the bathroom, where he raped her. The robbers then murdered Michael Taylor by shooting him in the head. The prosecution offered no evidence showing who fired the shots that killed either the Hassans or Michael Taylor.

The jury convicted petitioner of three counts of murder (Pen. Code, § 187),[1] five counts of robbery (§ 211), two counts of burglary (§ 459) and one count of rape in concert (§§ 261, subd. (2), 264.1), and found that he was armed with a firearm in the course of each offense (§ 12022, subd. (a)). With respect to the three counts of murder, the jury found these special circumstances: robbery murder (§ 190.2, subd. (a)(17)(i)), burglary murder (§ 190.2, subd. (a)(17)(vii)), and multiple murder (§ 190.2, subd. (a)(3)). In addition, as to one of the counts of murder, the jury found the existence of a rape-murder special circumstance (§ 190.2, subd. (a)(17)(iii)).

At the penalty phase of the trial, the prosecution presented evidence, in aggravation of penalty, that at the age of 18 petitioner had shot a former gang member, Mark Howard, in an incident unrelated to the murders in this

---

[1] All statutory references are to the Penal Code.

case. These were the circumstances that led to the shooting: Howard was in Helen Keller Park in the Los Angeles area, when Walter Gregory approached and said that petitioner wanted to talk to him. Howard then spoke to petitioner, who was with a group of people. Petitioner demanded that Howard return a radio that Howard had taken from Gregory. Howard said he took the radio because Gregory owed him money. Petitioner produced a revolver and said that if Howard did not return the radio he would blow Howard's head off. Howard slapped petitioner, whereupon petitioner shot Howard six times in the stomach and the chest. Howard recovered, but a bullet remains lodged close to his spine, and his ability to use his left leg is seriously impaired. As a result of this incident, petitioner entered a plea of guilty to a charge of assault with a deadly weapon, and was sentenced to three years in prison. The parties stipulated that Howard was an ex-gang member who was once associated with the Denver Lanes and Athens Park Boys gangs.

Petitioner offered no evidence at the penalty phase of his capital trial. At petitioner's request, the court took judicial notice that Jerome Evan Malett, an accomplice in the murder of Michael Taylor, had been convicted of eight offenses arising out of the Taylor killing, one of which was first degree murder, and that the trial court had sentenced Malett to a term of twenty-seven years to life on the charge of murder, to run consecutively to a term of twenty-one years, four months on the other crimes. The parties also stipulated that petitioner was born on February 1, 1959 (and thus was 21 years old in December 1980, when the murders occurred).

## II

At the reference hearing, the referee found that 15 witnesses would have been available to testify for petitioner at the penalty phase of his capital trial, but that none was called by the defense. The witnesses included petitioner's mother, his brothers, and his sisters. Other witnesses were petitioner's aunts, Murdie Faye Washington (a legislative analyst for the City of Los Angeles), Gwendolyn Frazier (an optician), and Geraldine Gray (an analyst in the workers' compensation department of a law firm); and petitioner's uncle, Alvin Williams, who at the time of petitioner's trial was a detective with the Los Angeles Police Department. The majority discusses in detail the nature of these witnesses' testimony. (Maj. opn., *ante*, pp. 190-194.)

In brief, as established at the reference hearing, the witnesses would have given this testimony at trial if they had been called: petitioner began life with a kindly disposition and in his early years was protective of his younger siblings, nieces, and nephews, but he was victimized by an angry, alcoholic,

abusive stepfather, who beat petitioner with a thick belt, and often administered those beatings for reasons relating more to his own inebriation than to petitioner's behavior. Petitioner's stepfather also mistreated petitioner's mother; this abuse, which on several occasions required police intervention, was administered in front of petitioner and his siblings.

The referee found the witnesses credible.

All of the witnesses could have been located with little difficulty: Casey Cohen, an investigator retained by petitioner's appellate counsel, testified that he was able to interview all of them in less than 2 weeks, and that he devoted only 15 or 16 hours to the task. Two of petitioner's sisters (Shelene Hearring and Denise Ross) and two of his aunts (Murdie Faye Washington and Gwendolyn Frazier) testified that they attempted to speak to petitioner's counsel during the trial, but that counsel showed no interest in talking to them.

Also testifying at the reference hearing were Charles Watson, an investigator retained by trial counsel, and Elizabeth Harris, who had served as the second attorney for the defense at petitioner's trial. Watson stated that he had interviewed only two penalty phase witnesses, both friends of petitioner. Attorney Harris testified that she had spoken to approximately three members of petitioner's family; all of the conversations occurred in the hallway of the courthouse or on the telephone. Harris also spoke to an expert on gang psychology and to the police officer who, at the guilt phase of petitioner's trial, had testified for the prosecution about petitioner's gang activities. Although Harris's primary responsibility was to prepare for the penalty phase of petitioner's trial, she obtained none of petitioner's school, juvenile, or prison records.

At the reference hearing, the prosecution offered no evidence to explain counsel's failure to interview petitioner's relatives. Petitioner's chief trial counsel, Gerald Lenoir, testified he could not recall whether there had been any tactical constraints that weighed against the presentation of testimony by petitioner's family members on petitioner's behalf. Lenoir's assistant, Attorney Harris, testified she was unaware of any financial or tactical constraints that would have weighed against presenting such evidence. When the prosecutor asked Harris at the reference hearing whether she believed she had ineffectively represented petitioner at the penalty phase of petitioner's capital trial, Harris responded: "I absolutely feel I did not do a competent job at the penalty phase, Mr. Semow, and I'm not happy to say that, but that's true."

## III

Under the Sixth Amendment to the United States Constitution, as well as under article I, section 15 of the California Constitution, a criminal defendant has the right to competent counsel. (*In re Marquez* (1992) 1 Cal.4th 584, 602 [3 Cal.Rptr.2d 727, 822 P.2d 435].) This means, " 'the reasonably competent assistance of an attorney acting as [a] diligent conscientious advocate.' " (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 215 [233 Cal.Rptr. 404, 729 P.2d 839].)

A capital defendant who asserts ineffective representation at the penalty phase of the trial must overcome two hurdles to obtain relief. First, the defendant must show that counsel's performance was deficient; i.e., that "counsel's representation fell below an objective standard of reasonableness." (*Strickland* v. *Washington* (1984) 466 U.S. 668, 688 [80 L.Ed.2d 674, 693, 104 S.Ct. 2052].) Second, the defendant must demonstrate that counsel's ineffectiveness resulted in prejudice. Ineffective assistance of counsel is prejudicial when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694 [80 L.Ed.2d at p. 698]; *In re Marquez, supra,* 1 Cal.4th at p. 603.) The defendant need not show that it is more likely than not that the outcome of the trial would have been different had the inadequacy not occurred. (*Strickland* v. *Washington, supra,* 466 U.S. at p. 693 [80 L.Ed.2d at p. 697]; *In re Wilson* (1992) 3 Cal.4th 945, 956 [13 Cal.Rptr.2d 269, 838 P.2d 1222].)

The majority declines to decide whether defense counsel's representation at the penalty phase of petitioner's capital trial was inadequate, because it concludes that any possible inadequacy was harmless. I do not share that conclusion, as I shall explain in part V. Thus, under the test set forth in *Strickland* v. *Washington, supra,* 466 U.S. 668, I must first determine whether defense counsel's investigation and preparation of the penalty phase was ineffective. As shown below, the evidence presented at the reference hearing supports the referee's findings that defense counsel's penalty phase preparation was "totally inadequate," and that "absolutely nothing of a competent nature was done by way of penalty phase preparation by defense counsel in this case."

### IV.   *Counsel's Deficient Performance*

The record at the reference hearing shows that petitioner's trial counsel made little or no effort to determine the existence of witnesses who could

testify on petitioner's behalf at the penalty phase of his capital trial. At the reference hearing, the investigator for the defense testified that the only penalty phase investigation he did was to interview two friends of petitioner, and to talk to petitioner's mother on the telephone. Elizabeth Harris, who assisted Attorney Gerald Lenoir in representing petitioner at the trial, testified that she spoke to three members of petitioner's family over the telephone or in the hallway at court. She never made any systematic effort to gather evidence in mitigation for presentation at the penalty phase. Members of petitioner's family were unanimous in their testimony that defense counsel made no attempt to interview them or to learn what evidence they might be able to offer on petitioner's behalf.

I recognize that sometimes family members may be reluctant or unwilling to testify on behalf of a defendant who is facing the death penalty. Not so here. At the reference hearing, petitioner's appellate counsel presented numerous family members who mentioned their willingness to testify on petitioner's behalf at his trial had they been asked to do so. It did not take too great an effort to locate these individuals; appellate counsel's investigator located and interviewed them in less than two weeks. The record provides no basis to conclude that trial counsel would have encountered greater difficulty in contacting these relatives; indeed, several family members testified that they attempted to speak to trial counsel but were rebuffed.

Nor does the record show that trial counsel attempted to gather any other mitigating evidence to offer on petitioner's behalf, aside from consulting an expert on gang psychology. As a result, defense counsel had no mitigating evidence to offer at the penalty phase of petitioner's trial.

To render effective assistance, counsel must perform effectively not only at trial but also in preparing for trial. To enable counsel to make intelligent decisions regarding the presentation of evidence, "counsel must make a rational and informed decision on strategy and tactics founded upon adequate investigation and preparation." (*In re Marquez, supra*, 1 Cal.4th at p. 602.) In this case, the failure to conduct an adequate investigation left the defense with no recourse other than to submit the issue of penalty to the jury solely on the prosecution's evidence.

The Attorney General insists that the penalty phase investigation by the defense team was adequate. He asserts that Attorney Harris interviewed "six or seven of petitioner's relatives, plus petitioner, Deputy Sheriff Ronnie Williams and a psychiatrist." But at the reference hearing petitioner's relatives testified that defense counsel had not interviewed them, and the referee found this testimony to be credible. Even if Attorney Harris did talk to these

individuals, the record supports the referee's conclusion that she never actually interviewed them. Moreover, Harris apparently made no written reports of the conversations in question; thus lead Attorney Lenoir had no adequate basis on which to make his decision whether to call any of petitioner's relatives to testify on petitioner's behalf at the penalty phase of his capital trial.

In the view of the Attorney General, petitioner's relatives who testified at the reference hearing were either lying or having a "universal failure of recollection" about their contacts with defense counsel. The Attorney General points to the statement by Gloria Brown (petitioner's mother) that no one ever asked her to testify on petitioner's behalf as being inconsistent with the testimony of (1) investigator Watson, who testified that he asked Brown to come to court and to bring another relative with her, and (2) Geraldine Gray (Brown's sister and petitioner's aunt), who testified that Brown asked her to come to court because defense counsel wanted character witnesses.[2] Even if one were to assume that Gloria Brown did not accurately recall the conversations she had with petitioner's attorneys and investigator, the Attorney General offers no reason for distrusting the testimony of petitioner's other relatives, all of whom stated at the reference hearing that neither of petitioner's two attorneys made any effort to call them as witnesses. Because the referee had the opportunity to observe the witnesses' demeanor and their manner of testifying, the referee's credibility determination must be given "great weight." (*In re Hitchings* (1993) 6 Cal.4th 97, 109 [24 Cal.Rptr.2d 74, 860 P.2d 466].) I see no reason to disturb that determination.

The Attorney General further contends that, at the time of petitioner's trial, evidence that petitioner's stepfather was an alcoholic who physically abused his wife and children was not available to the defense. Therefore, the Attorney General argues, trial counsel cannot be faulted for failing to discover such evidence. The Attorney General asserts that at the time of petitioner's trial no family member would have been willing to discuss these matters because they were in a state of "denial." The Attorney General points out that no one in petitioner's family disclosed the abuse to trial counsel, and that in an interview with a California Youth Authority psychiatrist several years before the trial in this case, petitioner denied he had been physically abused. Additionally, the Attorney General notes that according

---

[2]Gray testified that when she came to court at Brown's request, a woman (possibly Attorney Harris) took her name and telephone number, saying that the defense would contact her if she was needed. Gray was never called. Brown testified that she attended trial frequently, but she was unsure whether she came to court during the penalty phase. I note that it took only two days to present the penalty phase testimony, which included the prosecution's aggravating evidence against defendant and codefendant Champion and the mitigating testimony offered by counsel for codefendant Champion.

to a psychiatrist who testified at the reference hearing on petitioner's behalf, victims of child and spousal abuse are frequently reluctant to admit the occurrence of abuse.

I agree with the referee that competent trial counsel would have unearthed information pertaining to the abuse to which petitioner's alcoholic stepfather subjected his wife and children. Although, as the Attorney General points out, victims of abuse are frequently reluctant to disclose such abuse, this reluctance would not have been shared by petitioner's aunts and uncle, nonvictims who had observed Henry Brown's abusive behavior towards his wife and children and who offered some of the strongest testimony in this regard at the reference hearing. Moreover, all of the family members testified at the reference hearing that, had they been asked, they would have been willing to testify at trial, and the referee found them to be credible witnesses.

The Attorney General argues that defense counsel "was not required to speak to every sibling and all other relatives in order to be considered a 'competent' attorney." True. But counsel's inadequacy here was not a failure to interview *all* members of petitioner's family, but the failure to interview *any* family member. As the referee found, "nothing, absolutely nothing of a competent nature was done by way of penalty phase preparation by defense counsel in this case."

Petitioner does not challenge the adequacy of defense counsel's representation at the *guilt* phase of the capital trial; indeed, given the strong evidence of guilt, it is unlikely that he could show that any inadequacy at the guilt phase was prejudicial. Nevertheless, in evaluating the adequacy of counsel's representation at the *penalty* phase, it is significant that counsel's representation of petitioner at the *guilt* phase was minimal at best. For instance, defense counsel filed no written motions on petitioner's behalf before, during, or after the trial. Defense counsel's cross-examination of prosecution witnesses was generally brief; the defense called no witnesses at the guilt phase. On several occasions, the defense either failed to object or made inadequate objections to arguably inadmissible evidence offered by the prosecutor at the guilt phase. (See *People* v. *Champion* (1995) 9 Cal.4th 879, 914, 918-919, 923 [39 Cal.Rptr.2d. 547, 891 P.2d 93].)

It may well be that a more strenuous defense effort at the guilt phase would have been futile. When the evidence leaves little doubt of a defendant's guilt in a particular case, it is not unreasonable for a defense attorney to offer little evidence at the guilt phase and to focus instead on the presentation of evidence in mitigation at the penalty phase. But in that situation, the

need to offer significant evidence in mitigation is particularly acute.[3] Here, defense counsel did little at either the guilt or the penalty phase of petitioner's capital trial.

The Attorney General asserts that trial counsel had sound tactical reasons for presenting no mitigating evidence at the penalty phase. This argument is flawed at its outset, because it assumes that trial counsel had conducted an investigation that provided an adequate basis on which to make an informed tactical decision whether to present such evidence. As the referee found, and as the evidence at the reference hearing showed, trial counsel undertook no such investigation; thus counsel was in no position to make the tactical decision that the Attorney General seeks to attribute to counsel. As this court has explained: " 'Unless a minimally adequate investigation is undertaken, it is impossible to make a tactical decision about whether to present or withhold mitigating evidence at the penalty phase.' [¶] . . . In some cases, counsel may reasonably decide not to put on mitigating evidence, but to make that decision counsel must understand what mitigating evidence is available . . . . [Counsel's] decision not to find out, and to offer nothing in mitigation, cannot be supported as a tactical choice." (*In re Marquez, supra,* 1 Cal.4th at p. 606.)

Even if trial counsel's investigation could somehow be characterized as adequate, counsel could not, on the facts of this case, have reasonably decided to offer no evidence at the penalty phase.

California's death penalty law requires that the jury at the penalty phase —in choosing between the alternative penalties of death and life imprisonment without possibility of parole—"be guided by the aggravating and mitigating circumstances" and "impose a sentence of death if [it] concludes that the aggravating circumstances outweigh the mitigating circumstances." (§ 190.3, final par.) Under this system, therefore, if the evidence submitted to the penalty jury shows only aggravating circumstances, with no counterbalancing mitigating circumstances, the jury essentially has no option other than to return a verdict of death. There can be no tactical advantage to the defense in putting the penalty jury in that situation, as petitioner's trial counsel did here.

At the guilt phase of petitioner's capital trial, the jury convicted petitioner of three counts of first degree murder, five counts of robbery, two counts of

---

[3]In cases in which the evidence of guilt is relatively weak, defense counsel may choose not to present marginally mitigating evidence in favor of an argument stressing a "lingering doubt" regarding the defendant's guilt. Such tactical decisions can, of course, be made only after an adequate investigation to learn whether mitigating evidence exists that may be offered on the defendant's behalf.

burglary, and one count of rape in concert. There was nothing mitigating about the circumstances of these crimes, with the possible exception that no evidence identified petitioner as the person who fired the fatal bullets. At the start of the penalty phase, the jury knew nothing about petitioner other than that he had committed these crimes and that he was a member of a juvenile gang. At the close of the penalty phase, the only additional information presented to the jury was that petitioner had committed another criminal offense that was the subject of an earlier, unrelated proceeding. With this massive accumulation of evidence in aggravation, it was essential that defense counsel give the penalty jury a reason to spare petitioner's life.

In general, the objective of defense counsel at the penalty phase must be to "portray the defendant as a human being with positive qualities" and to "attempt to convince the sentencer that the defendant has redeeming qualities." (Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases* (1983) 58 N.Y.U. L.Rev. 299, 335, fn. omitted.) "A true advocate cannot permit a capital case to go to the sentencer on the prosecution's one-sided portrayal alone and claim to be rendering effective assistance." (*Ibid.*) The task of defense counsel is "to gather and present at least some evidence of the defendant's background which might serve to explain the defendant's crimes and elicit a compassionate response from the sentencer." (*Id.* at p. 336.)

What to offer as mitigating evidence may depend on what the prosecution can be expected to present in rebuttal of that evidence. Thus, as the Attorney General in this case points out, there may be tactical reasons for a defense attorney not to present certain witnesses, or not to offer evidence of particular incidents in the defendant's life or particular traits of the defendant's character. But the availability of rebuttal evidence can never justify a defense attorney's decision to present no mitigating evidence at all, when the result is to leave the penalty jury with only one possible penalty verdict—death.[4]

In short, here the evidence at the reference hearing amply supports the referee's conclusion that trial counsel's investigation and presentation of evidence at the penalty phase of petitioner's capital case was totally inadequate, and was unsupported by any tactical justification.

---

[4] I do not assert that competent defense counsel must *always* present mitigating evidence at the penalty phase. In some cases, the circumstances of the crime itself may be sufficiently mitigating that counsel may elect not to divert the jury's focus with other evidence. In other cases, the presentation of mitigating evidence at the guilt phase of trial may obviate the need for additional mitigating evidence at the penalty phase. Here, however, the circumstances of the crimes committed by petitioner were not mitigating, and trial counsel offered no mitigating evidence at the guilt phase.

## V.  *Prejudice to Petitioner*

The majority concludes that any inadequacy by defense counsel at the penalty phase of petitioner's capital trial did not prejudice petitioner. This conclusion appears to be based on three grounds: (1) that the effectiveness of petitioner's evidence in mitigation would, if presented at trial, have been substantially weakened by the prosecutor's evidence in rebuttal; (2) that defense counsel presented a persuasive argument in mitigation to the jury, and that the mitigating evidence not presented would thus be relatively unimportant; and (3) the prosecution's case in aggravation was so strong that petitioner's evidence in mitigation would have been insufficient to overcome it. As I shall explain, none of these arguments is convincing.

### A.  *Impeachment and Rebuttal*

The majority asserts that the mitigating evidence petitioner offered at the reference hearing could not have altered the outcome of petitioner's capital trial because at trial the presentation of that evidence would have been subject to "substantial impeachment and potentially devastating rebuttal." (Maj. opn., *ante*, p. 205.) Not so.

According to the majority, the force of the mitigating evidence that petitioner's stepfather subjected him to abusive treatment would have been weakened considerably by a psychiatric report that was prepared when petitioner was 15 years old, and included a statement by petitioner that his stepfather had never physically abused him. Petitioner's proof of the abuse, the majority states, would have been further impaired by the fact that his mother, who left petitioner's abusive stepfather when petitioner was a teenager, later reconciled with petitioner's stepfather. In my view, this "impeachment" is so weak as to be virtually meaningless. The psychiatric report was prepared for a juvenile court judge, following petitioner's confinement at a juvenile camp where he had been placed for approximately six months. It is hardly surprising that after being unable to go home for many months, a 15-year-old teenager would deny the existence of any problems that might cause a judge to deny him the opportunity to return to his family. Nor should special significance be attached to the reconciliation of petitioner's mother with her abusive husband; tragically, such reconciliations are commonplace in our society.

The majority's reliance on this "impeachment" might have some merit if proof of the abuse depended solely on the testimony of petitioner and his mother. But at the reference hearing there were numerous other witnesses—

petitioner's brothers, sisters, aunts, and uncle—who testified to the physical and mental abuse to which petitioner was subjected as a child. The referee found these relatives to be credible witnesses. Their testimony is in no way impeached by petitioner's statements to the psychiatrist or by the reconciliation of petitioner's mother with his stepfather.

The majority asserts that if, at the penalty phase of his capital trial, petitioner had presented the mitigating testimony offered at the reference hearing, the prosecution would have been able to rebut that testimony with evidence that petitioner had engaged in criminal acts as a teenager. This rebuttal, the majority states, would have included three sustained petitions alleging burglary involving theft of guns, one sustained petition alleging four counts of robbery, and one sustained petition alleging that petitioner brandished a cooking fork. Assuming for the sake of argument that evidence of petitioner's juvenile delinquency would have been admissible,[5] it would have had little weight. The jury already knew (from evidence presented at the guilt phase of petitioner's capital trial) that in his teenage years petitioner was a gang member and that at the age of 18 he had shot another gang member, Mark Howard. Thus, evidence that petitioner had engaged in additional delinquent acts as a teenager would not have added significantly to the jury's understanding of petitioner's character. Petitioner's presentation at the reference hearing suggested that the brutal physical abuse he suffered as a child at the hands of his stepfather had a profound adverse affect on his initial kindly disposition. Evidence of petitioner's criminal conduct as a teenager would have done little to rebut this argument.

## B. *Counsel's Penalty Phase Argument*

The majority examines at some length "the record of what counsel *did* do at trial." Petitioner's trial attorneys, the majority asserts, did not "give up";

---

[5]It is unclear whether the trial court would have admitted this evidence. Evidence of a defendant's commission of violent criminal acts is generally admissible as part of the prosecution's case-in-chief at the penalty phase of a capital trial. At petitioner's trial, however, the trial court excluded the evidence that petitioner had engaged in violent conduct as a juvenile on the ground that the prosecution had failed to give the defense adequate notice of its intent to use this evidence. Notwithstanding the trial court's conclusion that this evidence was inadmissible as part of the prosecution's case-in-chief, the court could have permitted the prosecution to use this evidence in rebuttal, but only if the court found that the evidence related directly to a particular incident or character trait that petitioner had offered on his own behalf. (*People* v. *Ramirez* (1990) 50 Cal.3d 1158, 1193 [270 Cal.Rptr. 286, 791 P.2d 965].) Here, the evidence of petitioner's violent criminal acts could not have been used to rebut the most important evidence offered by petitioner at the reference hearing—that he was subjected to physical and mental abuse by his stepfather—but it might have been marginally relevant to rebut the evidence that, as a child, petitioner was loving and protective of his cousins and younger sister.

rather, they "had a specific tactical approach," and "gave the penalty jury a reason to spare defendant's life." (Maj. opn., *ante*, p. 209.) The majority reasons that Attorney Lenoir did such a good job at the penalty phase that his performance "would have justified a decision not to use the additional evidence presented at the reference hearing even after full investigation" and thus that counsel's performance "must be considered in deciding whether it is reasonably probable the result would have been different had the evidence been presented." (Maj. opn., *ante*, p. 211.) I cannot agree with the majority that trial counsel made an effective presentation at the penalty phase of petitioner's capital case, or that counsel gave the jury a reason to spare petitioner's life.

The majority points to evidence that defense counsel presented (through a stipulation with the prosecutor) that Mark Howard, who was shot by petitioner when petitioner was 18 years old (see pt. I, *ante*), was a "former gang member." I do not see how Howard's gang membership would play a significant role in persuading the jury to spare petitioner's life: unless one regards an assault on a former gang member as commendable behavior, this evidence did not *mitigate*; that is, the jury would not consider it as an affirmative reason not to impose the death sentence. At best, it slightly weakened a portion of the prosecution's case in aggravation.

According to the majority, defense counsel gave the jury a reason to spare petitioner's life when the defense, through stipulation, revealed that codefendant Malett received a life sentence for murdering Michael Taylor, and that Malett's jury found that Malett used a firearm in the commission of that crime. In his closing argument to the jury, petitioner's trial counsel argued that this finding by Malett's jury showed that Malett, not petitioner, was the actual killer of Michael Taylor and that it would be unjust for the jury to sentence petitioner to death when Malett had not received a similar sentence. But as the prosecutor effectively emphasized in his closing argument, Malett's jury found *not true* an allegation that Malett "personally" inflicted great bodily injury on the victim. That finding indicated that Malett's jury was not convinced that Malett was the actual killer. Moreover, Malett was convicted only of the murder of Michael Taylor, while petitioner was convicted of murdering not only Taylor but also Bobby and Eric Hassan. Under these circumstances, the jury deciding petitioner's penalty may well have found no unfairness in Malett's receiving a lighter sentence than petitioner. Therefore, contrary to the majority's assertion, it cannot be said that codefendant Malett's sentence provided the jury with a reason to spare petitioner's life.

In any event, as the majority acknowledges, this court has held that evidence about the fate of codefendants in a capital case is irrelevant,

because it has no bearing on "the character and record of the defendant" that form the basis for determining whether a person convicted of capital murder should be sentenced to death. (*People* v. *Belmontes* (1988) 45 Cal.3d 744, 811 [248 Cal.Rptr. 126, 755 P.2d 310].) And here, in closing argument to the jury, the prosecutor pointed out that codefendant Malett's sentence was irrelevant to the penalty determination: "The fact is that it's not the test for your purposes as to whether or not this case is more or less aggravated than some other case."

The trial court in this case properly instructed the jury at the penalty phase on the factors it was entitled to consider in deciding whether to sentence petitioner to death.[6] Because codefendant Malett's life sentence had no bearing on any of those factors, we must assume that the jury gave it little or no weight.

Finally, the majority notes that defense counsel mentioned to the jury petitioner's age and that counsel made a closing argument at the penalty phase. But neither petitioner's age (21 when he committed the murders) nor defense counsel's closing argument gave the jury a plausible reason to spare petitioner's life. Counsel's argument was short (it encompasses only 10 pages of transcript, 4 of which are mostly blank) and, in my view, not particularly persuasive.[7]

## C.   *Evidence in Aggravation*

The majority considers any ineffectiveness by petitioner's trial counsel at the penalty phase harmless in light of the strong aggravating evidence presented by the prosecution. I disagree. In my view, the majority's position is inconsistent with previous decisions by this court and by the federal courts.

---

[6]The trial court read to the jury former CALJIC No. 8.84.1 (4th ed. 1979), which sets forth the applicable aggravating and mitigating factors. The instruction is set forth in full in this court's opinion affirming petitioner's conviction on appeal. (*People* v. *Champion, supra,* 9 Cal.4th at p. 943, fn. 32.)

[7]In his closing argument, defense counsel argued that petitioner would adjust well to prison if sentenced to life imprisonment without possibility of parole, pointing out that the record contained no evidence that petitioner had ever misbehaved while in confinement. The majority asserts that counsel could not have made this argument if petitioner had presented the mitigating evidence offered at the reference hearing, because the prosecution would, in rebuttal, have presented evidence that as a teenager petitioner had misbehaved in confinement, when he brandished a large serving fork at a cook in a juvenile camp in which he had been ordered placed. I find it difficult to imagine that a jury, having concluded that petitioner would adapt well to a prison setting and that it should spare petitioner's life, would be dissuaded from this conclusion upon learning of the "fork brandishing" incident.

I do not wish to downplay the seriousness of petitioner's crimes; as the majority has pointed out, the circumstances of the offenses constituted strong aggravating evidence. It may well be that even if trial counsel had conducted an adequate investigation and presented to the jury at the penalty phase the evidence in mitigation heard by the referee in this case, the jury would nevertheless have returned a verdict of death. But that should not be the focus of our inquiry. The United States Supreme Court has said that to obtain relief on the ground that trial counsel was ineffective, a defendant need not show that it was *more likely than not* that a different result would have occurred if counsel had given the defendant effective representation. (*Strickland* v. *Washington, supra,* 466 U.S. at p. 693 [80 L.Ed.2d at p. 697].) Rather, the defendant need only show a "reasonable probability" that counsel's ineffective representation affected the result in the case; that is, a probability "sufficient to undermine confidence in the outcome." (*Id.* at p. 694 [80 L.Ed.2d at p. 698].)

This case is strikingly similar to *In re Marquez, supra,* 1 Cal.4th 584, in which this court recently reversed a death judgment because of defense counsel's failure to present any mitigating evidence at the penalty phase. There, the jury convicted the defendant of multiple counts of murder and robbery, arising out of two unrelated killings. At the penalty phase of the trial, the defense counsel, as a result of inadequate investigation, presented no mitigating evidence on the defendant's behalf. The defendant filed a petition for writ of habeas corpus; we issued an order to show cause and an order of reference. At the reference hearing, the defendant presented the testimony of family members who would have been willing to appear as witnesses on the defendant's behalf at the penalty phase of his criminal trial. These witnesses testified to the defendant's good character as a child; they also mentioned that the defendant had assisted his mother and sisters with "women's work," saved a calf from slaughter, and at the age of eight worked to contribute income to his family. In reversing the judgment of death, this court pointed out that the mitigating evidence "was substantial, and not cumulative to any evidence offered at trial" and would have permitted the jury "to make an 'individualized' decision, one based not only on the facts of the crime, but on the whole life of the defendant." (*Id.* at p. 609.)

Here, as in *Marquez, supra,* 1 Cal.4th 584, petitioner committed multiple acts of robbery and murder. Here, as in *Marquez,* defense counsel, as a result of his inadequate investigation, offered no relevant evidence in mitigation at the penalty phase of the trial. Here, as in *Marquez,* the mitigating evidence that petitioner offered at the reference hearing pertained to his character as a child—he was kind and helpful, and assisted in caring for younger family members. But here, unlike *Marquez,* there was also additional mitigating

evidence available: at the reference hearing, numerous witnesses testified that petitioner suffered childhood abuse at the hands of his alcoholic step-father, testimony that the referee found credible.

I note that similar evidence presented at reference hearings has led to the reversal of death judgments for ineffective assistance of counsel in several federal cases that were discussed in this court's decision in *In re Marquez, supra,* 1 Cal.4th 584. For instance, in *Thomas* v. *Kemp* (11th Cir. 1986) 796 F.2d 1322, 1325, two of the defendant's high school teachers testified at the reference hearing that he had a "difficult home environment," had suffered "mental and physical abuse," and that his mother had a "drinking problem." The federal reviewing court held that trial counsel's failure to offer this mitigating evidence together with evidence of the defendant's good character eliminated "the key aspect of the penalty trial," thus preventing the jury from taking into consideration the personal characteristics of the defendant as is necessary for an "individualized" penalty determination. (*Ibid.*) And in *Pickens* v. *Lockhart* (8th Cir. 1983) 714 F.2d 1455, the federal court of appeals reversed the defendant's death sentence, based on the defense attorney's failure to offer evidence of the defendant's "turbulent family background, beatings by a harsh father, and emotional instability." (*Id.* at p. 1466.) Additionally, in *Armstrong* v. *Dugger* (11th Cir. 1987) 833 F.2d 1430, and in *Blake* v. *Kemp* (11th Cir. 1985) 758 F.2d 523, the federal reviewing court held that the defense counsel's failure to offer any mitigating evidence at the penalty phase of a capital trial established ineffective representation and required reversal of the judgment of death.

More recent federal decisions are in accord. Where defense counsel offered some mitigating evidence at either the guilt or the penalty phase of a capital trial, federal courts have sometimes treated the failure to offer additional mitigating evidence as either harmless or as tactically justified. But where defense counsel presented no evidence in mitigation, and the defendant later showed in habeas corpus proceedings that trial counsel could have presented a plausible case in mitigation, federal courts have generally held such failure to be ineffective representation requiring reversal of the death judgment. (*Jackson* v. *Herring* (11th Cir. 1995) 42 F.3d 1350; *Cave* v. *Singletary* (11th Cir. 1992) 971 F.2d 1513; *Deutscher* v. *Whitley* (9th Cir. 1991) 946 F.2d 1443; *Blanco* v. *Singletary* (11th Cir. 1991) 943 F.2d 1477; *Horton* v. *Zant* (11th Cir. 1991) 941 F.2d 1449; *Kenley* v. *Armontrout* (8th Cir. 1991) 937 F.2d 1298; *Harris* v. *Dugger* (11th Cir. 1989) 874 F.2d 756; *Middleton* v. *Dugger* (11th Cir. 1988) 849 F.2d 491; *Ford* v. *Lockhart* (E.D.Ark. 1994) 861 F.Supp. 1447; *Eutzy* v. *Dugger* (N.D.Fla. 1989) 746 F.Supp. 1492.)

The majority states that in *People* v. *Mayfield* (1993) 5 Cal.4th 142 [19 Cal.Rptr.2d 836, 852 P.2d 331], this court found trial counsel's ineffectiveness to be harmless under facts similar to those in this case. I dissented from the majority's conclusion in *Mayfield* that counsel's ineffectiveness was harmless. In any event, *Mayfield* is readily distinguishable. In *Mayfield*, defense counsel called a psychologist who "gave evidence of [the defendant's] background, medical difficulties, character and remorse." (*Id.* at p. 202.) Here, by contrast, trial counsel did not call a single witness to testify on petitioner's behalf at the penalty phase. As a consequence, the jury was given no information to assist in its penalty determination. To borrow a phrase from *Tyler* v. *Kemp* (11th Cir. 1985) 755 F.2d 741, 745: "The death penalty that resulted in this case was thus robbed of the reliability essential to assure confidence in that decision."

## CONCLUSION

Recently, in vacating a judgment of death because of ineffective assistance of counsel, based on counsel's failure to present any mitigating evidence at the penalty phase of the trial, this court stated: "[T]he mitigating evidence uncovered in the habeas corpus investigation . . . was substantial, and not cumulative to any evidence offered at trial. . . . It would, in short, permit the jury to make an 'individualized' decision, one based not only on the facts of the crime, but on the whole life of the defendant." (*In re Marquez, supra*, 1 Cal.4th at p. 609) The same is true here.

As in *In re Marquez, supra*, 1 Cal.4th 584, defense counsel in this case failed to investigate and to present at the penalty phase of petitioner's capital trial available mitigating evidence about petitioner's background and character. As a result, the jurors deciding petitioner's fate knew him only as a criminal whom they had just convicted of serious crimes, including the murder of three persons. Had petitioner's trial counsel presented to the jury at the penalty phase a more complete picture of petitioner as a human being —including the physical abuse petitioner had endured and the positive character traits he had shown as a child—the jury might have found sufficient redeeming qualities to elicit a compassionate response and might have returned a verdict of life in prison without parole, rather than death. As this court has explained, a penalty juror may properly conclude that a single mitigating circumstance outweighs all the aggravating evidence. (*People* v. *Berryman* (1993) 6 Cal.4th 1048, 1099 [25 Cal.Rptr.2d 867, 864 P.2d 40].)

I do not say that a penalty verdict other than death would have been certain, or even more likely than not. I conclude only that on the facts of this case, in which the jury at the penalty phase of petitioner's capital trial

received none of the significant mitigating evidence that existed and that defense counsel could have unearthed without too much effort, my confidence in the verdict of death has been undermined to the point that, in my view, the judgment of death should not be permitted to stand.

Petitioner's application for a rehearing was denied July 12, 1995. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.